**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

_____
|  :
Cabot East Broward 2 LLC, Patricia D. Souza,  | :  CASE NO.
and Cabot East Broward 34 LLC, individually  | :
and on behalf of all others similarly situated,  | :
            Plaintiffs,  | :  CLASS ACTION
|  :
 v.  | :  JURY TRIAL DEMANDED
|  :
Carlton P. Cabot, Timothy J. Kroll,  | :
Cabot Investment Properties, LLC,  | :
Cabot East Broward LeaseCo, LLC,  | :
Cabot North Orange LeaseCo, LLC,  | :
Cabot Oak Grove Asset Manager, LLC,  | :
Cabot Trafalgar/Avion LeaseCo, LLC,  | :
Cabot Cypress Creek LeaseCo, LLC,  | :
Cabot North University LeaseCo, LLC,  | :
CBRE, Inc., Gloria Hernandez,  | :
Harry L. Silverman, and  | :
Actuarial Risk Management, Ltd.,  | :
|  :
            Defendants.  | :
_____ :

## CLASS ACTION COMPLAINT

     Plaintiffs Cabot East Broward 2 LLC, Patricia D. Souza, and Cabot East Broward 34 LLC bring this Class Action Complaint pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated investors who purchased Tenant-in-Common interests in one or more of six commercial properties located throughout Florida from Defendant CABOT INVESTMENT PROPERTIES, LLC or one of its wholly owned subsidiaries and allege as follows:

     1.     Plaintiffs seek damages and other relief from Defendants CARLTON P. CABOT, TIMOTHY J. KROLL, CABOT INVESTMENT PROPERTIES, LLC, CABOT EAST BROWARD LEASECO, LLC, CABOT NORTH ORANGE LEASECO, LLC, CABOT OAK GROVE ASSET MANAGER, LLC, CABOT TRAFALGAR/AVION LEASECO, LLC, CABOT CYPRESS CREEK LEASECO, LLC, CABOT NORTH UNIVERSITY LEASECO, LLC, CBRE, INC., GLORIA HERNANDEZ, HARRY L. SILVERMAN, and ACTUARIAL RISK MANAGEMENT, LTD (collectively the "DEFENDANTS").

## INTRODUCTON AND BACKGROUND

2.      Plaintiffs and the Class are Delaware limited liability companies whose owners/members are comprised of mostly older, retired individuals who collectively invested more than $156 million dollars to purchase commercial real estate throughout Florida.  The investments are known as Tenant-in-Common ("TIC") investments or 1031 Exchanges, a reference to Section 1031 of the Internal Revenue Code.  Section 1031 allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those capital gains when they are re-invested in a qualifying property.

3.      Plaintiffs and the Class, however, never realized the benefits of their TIC investments because CARLTON P. CABOT ("CABOT") and TIMOTHY J. KROLL ("KROLL"), the individuals who owned and/or controlled the TIC investment sponsors, embezzled at least $7.9 million from Plaintiffs' and the Class' properties from 2008 to 2012. The embezzlement losses eventually resulted in defaults and foreclosures on the loans that financed the property acquisitions, resulting in damages in excess of $156 million.

4.      In 2015, federal authorities arrested and criminally charged CABOT and KROLL for the embezzlement.  Both CABOT and KROLL have entered guilty pleas and admitted that they embezzled millions of dollars from their TIC investors.

5.      As alleged below, CABOT and KROLL were only able to steal millions of dollars from Plaintiffs and the Class for several years because they had the help of others, including Defendants CBRE, INC. ("CBRE"), GLORIA HERNANDEZ ("HERNANDEZ"), HARRY L. SILVERMAN ("SILVERMAN"), and ACTUARIAL RISK MANAGEMENT, LTD. ("ACTUARIAL RISK").  CBRE, HERNANDEZ, SILVERMAN, and ACTUARIAL RISK helped CABOT and KROLL perpetrate the near $8 million embezzlement, helped conceal the embezzlement, and/or failed to alert Plaintiffs and the Class to the embezzlement, all causing substantial damages.

6.      CBRE provided professional property management services for the six commercial properties that are the subject of this Complaint.  HERNANDEZ was a Senior Real Estate Manager at CBRE who managed from January 2008 through January 2011 one of the properties that is the subject of this Complaint.  Among CBRE's duties were the control, management, and financial reporting of the monies stolen by CABOT and KROLL.  So, instead of preventing, stopping, or alerting Plaintiffs and the Class about the embezzlement, CBRE and

HERNANDEZ stood silent and actively assisted CABOT and KROLL to continue and conceal the embezzlement.

7.      SILVERMAN, a Managing Director of ACTUARIAL RISK from January 2010 to the present, was a former Certified Public Accountant who provided accounting services, among other things, to CABOT INVESTMENT PROPERTIES, LLC ("CABOT INVESTMENT") and its wholly owned subsidiaries.  SILVERMAN also failed to alert Plaintiffs and the Class to the embezzlement even though he knew CABOT and KROLL were stealing millions of dollars from them.  Instead, SILVERMAN affirmatively helped KROLL prepare false and misleading Investor Reports that hid the embezzlement from them.  SILVERMAN has received federal "use immunity" for his testimony in connection with CABOT's and KROLL's criminal prosecutions, but that immunity does not insulate him from civil liability.

8.      As a result of the embezzlement facilitated and concealed by the DEFENDANTS, Plaintiffs and the Class have suffered or will suffer more than $156,770,000 in damages from loss of their investment principal alone.  Plaintiffs and the Class have also suffered additional losses arising from years of unpaid monthly "base rents" or distributions due on their investments.  Plaintiffs and the Class also face tax-related losses from the IRS's potential tax re-classification of the TIC investments as a result of foreclosures on the properties which could cause Plaintiffs and the Class to owe the IRS millions of dollars in back taxes, interest, and penalties.

## SUBJECT MATTER JURIDISCTION

9.      This Court has diversity jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) and 1367, in that the amount in controversy exceeds $5 million, exclusive of interest and costs, and some members of the proposed Class are citizens of a state different from the state citizenship of at least one of the DEFENDANTS.

10.     Plaintiff Cabot East Broward 2 LLC ("East Broward 2") is a Delaware limited liability company.  Its principal place of business is the state of Massachusetts.

11.     Plaintiff Patricia D. Souza is a member of East Broward 2 and a citizen of the state of Massachusetts.

12.     Plaintiff Cabot East Broward 34 LLC ("East Broward 34") is a Delaware limited liability company.  Its principal place of business is the state of California.

13.     Defendant CABOT INVESTMENT is a privately-held real estate Massachusetts corporation with its principal place of business in New York, New York.

14.     Defendant CABOT is a citizen of Massachusetts.

15.     Defendant KROLL is a citizen of New York.

16.     Defendants CABOT EAST BROWARD LEASECO, LLC ("BROWARD LEASECO"), CABOT NORTH ORANGE LEASECO, LLC ("NORTH ORANGE LEASECO"), CABOT OAK GROVE ASSET MANAGER, LLC ("OAK GROVE MANAGER"), CABOT TRAFALGAR/AVION LEASECO, LLC ("TRAFALGAR/AVION LEASECO"), CABOT CYPRESS CREEK LEASECO, LLC ("CYPRESS CREEK LEASECO"), and CABOT NORTH UNIVERSITY LEASECO, LLC ("NORTH UNIVERSITY LEASECO"), are all Delaware limited liability companies, whose members are citizens of Massachusetts and New York.

17.     Defendant SILVERMAN is a citizen of the state of Florida.

18.     Defendant ACTUARIAL RISK is a Texas limited partnership with its principal place of business in Texas.

19.     Defendant CBRE is a Delaware corporation registered to conduct business in Florida, and CBRE does, in fact, regularly conduct business in Florida.  CBRE's principal place of business is Florida.  CBRE was formerly known as CB Richard Ellis, Inc.

20.     Defendant HERNANDEZ is a citizen of the state of Florida.

21.     Minimal diversity sufficient to satisfy 28 U.S.C. §1332(d) is provided by, *inter alia*:

a.      The diverse citizenship of Plaintiff East Broward 2 (Delaware and Massachusetts) and (i) Defendant HERNANDEZ (Florida) and (ii) Defendant CBRE (Delaware and Florida); and

b.      The diverse citizenship of Plaintiff Patricia D. Souza (Massachusetts) and (i) Defendant HERNANDEZ (Florida) and (ii) Defendant CBRE (Delaware and Florida).

**PERSONAL JURISDICTION**

22.     This Court has personal jurisdiction over DEFENDANTS pursuant to Section 48.193(1)(a)(2), Florida Statutes, because DEFENDANTS committed tortious acts in the State of Florida stemming from the embezzlement of at least $7.9 million from six Florida properties, causing substantial damages to Plaintiffs and the Class.  DEFENDANTS perpetrated the

embezzlement, facilitated the embezzlement, concealed the embezzlement, and/or failed to alert Plaintiffs and the Class to the embezzlement despite a duty to do so.

23.     This Court also has personal jurisdiction over DEFENDANTS pursuant to Section 48.193(1)(a), Florida Statutes, because the Complaint alleges that DEFENDANTS were members of a civil conspiracy and that one or more of the Defendants committed tortious acts in Florida in furtherance of the conspiracy.

24.     For the following Defendants, this Court also has personal jurisdiction pursuant to Section 48.193(1)(a)(1), Florida Statutes, because the Defendants operate, conduct, engage in, or carry on a business venture in the State of Florida for pecuniary benefit, or have an office or agency in this state, by virtue of the following:

a.      CABOT INVESTMENT organized and sponsored investments in the six Florida properties that are the subject of this Complaint over the course of several years, and created and sent Investor Reports to investors in Florida pertaining to the six Florida properties;

b.      BROWARD LEASECO, NORTH ORANGE LEASECO, OAK GROVE MANAGER, TRAFALGAR/AVION LEASECO, CYPRESS CREEK LEASECO, and NORTH UNIVERSITY LEASECO entered into Master Lease Agreements and other agreements governing the operation and management of the six Florida properties that are the subject of this Complaint, and sent Investor Reports to investors in Florida pertaining to the six Florida properties;

c.      CABOT organized and sponsored investments in the six Florida properties that are the subject of this Complaint over the course of several years, and created and sent Investor Reports to investors in Florida pertaining to the six Florida properties;

d.      KROLL organized and sponsored investments in the six Florida properties that are the subject of this Complaint over the course of several years, and created and sent Investor Reports to investors in Florida pertaining to the six Florida properties; and

e.      CBRE is registered to conduct business in Florida and maintains a Registered Agent in Plantation, Florida in Broward County.   CBRE provided on site management of each of the six Florida properties that are the subject of this Complaint.

25.     This Court has general personal jurisdiction over Defendants CABOT INVESTMENT, BROWARD LEASECO, NORTH ORANGE LEASECO, OAK GROVE MANAGER, TRAFALGAR/AVION LEASECO, CYPRESS CREEK LEASECO, and NORTH

UNIVERSITY LEASECO, CABOT, KROLL and CBRE pursuant to Section 48.193(2), Florida Statutes, because these Defendants have engaged in continuous, systematic, substantial and not isolated activity within this State by virtue of, *inter alia*, organizing and sponsoring investments in the six Florida properties, providing management services for the six Florida properties, and creating and sending, or causing the creation and sending of, Investor Reports to investors in Florida pertaining to the six Florida properties, which actions spanned over the course of multiple years.

26.     This court also has general personal jurisdiction over SILVERMAN because he is a resident and/or domiciliary of Florida.

27.     This court also has general personal jurisdiction over HERNANDEZ because she is a citizen of Florida.

28.     This Court has personal jurisdiction over DEFENDANTS sufficient to satisfy Constitutional due process because each Defendant has sufficient minimum contacts with the State of Florida with respect to the subject matter of this action, such that each could reasonably anticipate being haled into court in this forum.

29.     CABOT INVESTMENT's minimum contacts include but are not limited to organizing and sponsoring investments in the six Florida properties that are the subject of this Complaint, and sending false and misleading Investor Reports to investors in Florida pertaining to the six Florida properties that are the subject of this Complaint.

30.     The minimum contacts of BROWARD LEASECO, NORTH ORANGE LEASECO, OAK GROVE MANAGER, TRAFALGAR/AVION LEASECO, CYPRESS CREEK LEASECO, and NORTH UNIVERSITY LEASECO, include but are not limited to entering into Master Lease Agreements and other agreements governing the operation and management of the six Florida properties that are the subject of this Complaint, and sending false and misleading Investor Reports to investors in Florida pertaining to the six Florida properties that are the subject of this Complaint.

31.     CABOT's minimum contacts include but are not limited to organizing and sponsoring investment in and the purchase of the six Florida properties that are the subject of this Complaint, and sending false and misleading Investor Reports to investors in Florida pertaining to the six Florida properties that are the subject of this Complaint.

32.     KROLL's minimum contacts include but are not limited to organizing and sponsoring investments in the six Florida properties that are the subject of this Complaint, and sending false and misleading Investor Reports to investors in Florida pertaining to the six Florida properties that are the subject of this Complaint.

33.     SILVERMAN's minimum contacts include but are not limited to preparing and reviewing Investor Reports regarding the six Florida properties that are the subject of this Complaint and causing false and misleading Investor Reports to be sent to and from Florida related to the six Florida properties that are the subject of this Complaint.

34.     ACTUARIAL RISK's minimum contacts are established through the conduct of its employee, SILVERMAN, while acting within the scope of his employment, including but not limited to causing false and misleading Investor Reports to be sent to and from Florida related to the six Florida properties that are the subject of this Complaint.

35.     This Court has general personal jurisdiction over CBRE because CBRE is registered to conduct business in Florida and maintains a Registered Agent in Plantation, Florida in Broward County.   CBRE also provided on site management of each of the six Florida properties that are the subject of this litigation.

36.     HERNANDEZ's minimum contacts include but are not limited to managing one of the Florida properties that is the subject of this Complaint.

## VENUE

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## PLAINTIFFS

38.     East Broward 2, a Delaware limited liability company, is a Tenant-in-Common investor in 100 and 110 East Broward Boulevard, Fort Lauderdale, Florida, one of the six Florida properties that is the subject of this Complaint.

39.     Patricia D. Souza is member of East Broward 2 and a Tenant-in-Common investor in 100 and 110 East Broward Boulevard, Fort Lauderdale, Florida.  Souza is a citizen of the state of Massachusetts.

40.     East Broward 34, a Delaware limited liability company, is a Tenant-in-Common investor in 100 and 110 East Broward Boulevard, Fort Lauderdale, Florida, one of the six Florida properties that is the subject of this Complaint.

## DEFENDANTS

41.     CABOT was at all relevant times the founder, President, and Chief Executive Officer of CABOT INVESTMENT.

42.     KROLL was at all relevant times the Chief Operating Officer of CABOT INVESTMENT.

43.     CABOT INVESTMENT specialized in sponsoring Tenant-in-Common 1031 Exchange investments.  CABOT INVESTMENT effectively went out of business near the end of 2012.

44.     BROWARD LEASECO, NORTH ORANGE LEASECO, OAK GROVE MANAGER, TRAFALGAR/AVION LEASECO, LLC, CYPRESS CREEK LEASECO, and NORTH UNIVERSITY LEASECO are all wholly owned and controlled subsidiaries or affiliates of CABOT INVESTMENT.

45.     CBRE provided professional property management services for the six commercial properties in Florida that are the subject of this Complaint from the start of CABOT and KROLL's embezzlement in 2008 through January 2011.

46.     HERNANDEZ was a Senior Real Estate Manager at CBRE from January 2008 through January 2011 and managed the property located at 100 and 110 East Broward Boulevard in Fort Lauderdale, Florida, one of the properties that is the subject of this Complaint.

47.     SILVERMAN provided consulting services, including accounting services, to CABOT INVESTMENT and its wholly owned subsidiaries from at least in or about 2003 through and including 2012.  SILVERMAN was a Managing Director at ACTUARIAL RISK from in or about January 2010 to the present.

48.     ACTUARIAL RISK is an actuarial and consulting firm that "works with many Top 30 accounting firms," according to its website.

## GENERAL ALLEGATIONS

### Tenant-in-Common Investments and the Federal Tax Law

49.     Plaintiffs and the Class are investors in Florida Tenant-in-Common investments, also known as 1031 Exchanges, sponsored by CABOT INVESTMENT.

50.     A TIC investment allows up to 35 investors to hold title to real property, such as an office building, as common law "tenants in common," whereby each investor owns a physically undivided interest in the property.  Each co-tenant's share in the property is expressed as a percentage interest of the whole.  For example, twenty TIC investors can come together to purchase an entire office building whereby each investor owns 5% of the building.  The twenty TIC investors thus own 100% of the building but each investor's interest is 5% of the whole building, rather than an interest in any given defined space within the building.

51.     TIC investments are appealing to many investors because of their federal tax benefits.  Section 1031 of the IRS Code allows individuals who have earned capital gains from the sale of real estate to legally defer paying federal taxes on those gains when they are re-invested in a similar property, subject to certain restrictions.  TIC investments are therefore attractive to investors who wish to defer capital gains tax liability from a prior sale of real estate.

52.     TIC investments offer other benefits, too.  TIC investors, for example, can earn a steady stream of income from base rents generated by the property during the term of the investment.  TIC investments are also passive, which many investors prefer because it relieves them of the responsibility of actively managing their investment property.

53.     The passive nature of the investment, potential tax benefits, and anticipated stream of steady income make TIC investments particularly attractive to older and retired investors, such as many of the members of the Class.

54.     A TIC investor, however, must take care to ensure that their TIC investment is classified by the IRS as an investment in rental real property – what the IRS refers to as "an undivided fractional interest in rental real property" – rather than an interest in a business entity, such as a partnership.  A TIC investment in real property is eligible for "tax-free exchange" under Section 1031(a)(1) of the Internal Revenue Code, *see* 26 U.S.C. § 1031(a)(1), whereas a TIC investment that that the IRS concludes is an interest in a partnership will subject the TIC investor to the very federal taxes that the investor sought to defer by investing in a TIC.[1]

---

[1] Section 1031(a)(1) of Title 26, United States Code, states that, "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." Section 1031(a)(2) includes "interests in a partnership," among other things, as an exception to Section 1031(a)(1).  26 U.S.C. § 1031(a)(2).

55.     To guide TIC investors, the IRS issued Revenue Procedure 2002-22 ("Procedure 2002-22") in 2002.   Procedure 2002-22 sets forth certain guidelines that the IRS uses to determine whether a TIC investment should be considered an interest in real property, where taxes are deferred, or an interest in a partnership, where taxes cannot be deferred.   Procedure 2002-22 contains 15 different guidelines.

56.     One of those guidelines is the "No Business Activities" rule.   In sum and substance, the TIC investment must be passive.   The No Business Activities rule prohibits individual TIC investors from participating in the management of the property to ensure that the investment is passive.   To comply with this rule, TIC investors usually hire a third party to manage the property rather than managing it themselves.

57.     A TIC investor who fails to follow IRS rules and guidelines for TIC investments can suffer significant adverse tax consequences, including liability for back taxes, interest, and penalties.

**CABOT INVESTMENT Sponsored 18 TIC Investments with Identical Structures**

58.     From in or about 2003 through in or about 2012, CABOT INVESTMENT sponsored 18 TIC investments in commercial properties located throughout the United States. All of the CABOT INVESTMENT TIC investment vehicles were essentially identical as each relied upon a common investment structure and "cookie cutter" agreements that provided for the allocation of identical rights and responsibilities among the sponsor, the TIC investors, the property management companies, lenders, and others.

59.     CABOT INVESTMENT originated each TIC investment by: (i) forming a wholly owned subsidiary of CABOT INVESTMENT to acquire the property underlying the TIC investment; (ii) negotiating a purchase price for a suitable piece of commercial real estate; (iii) raising cash from as many as 35 TIC investors for the capital component of the purchase price; (iv) obtaining a bank loan secured by a mortgage for the balance of the purchase price; (v) forming a wholly owned subsidiary of CABOT INVESTMENT to lease the property from the TIC investor owners; and (vi) causing the wholly owned subsidiary of CABOT INVESTMENT to enter into a management agreement with an independent, professional property management company to manage the day-to-day operations of the property, including financial, accounting, and banking matters.

60.     After the transaction closed, the property manager provided both day-to-day and regular monthly operational and financial reports to CABOT INVESTMENT and/or one of its wholly owned subsidiaries.

61.     CABOT and KROLL used the property manager's financial reports to generate Investor Reports that were periodically sent to Plaintiffs and the Class.  The Investor Reports contained detailed financial information, including a balance sheet, for each TIC investment. The Investor Reports described how much money had been generated by the property and how that money was spent or allocated.  None of the Investor Reports disclosed or revealed that CABOT and KROLL were either misappropriating or embezzling money from the TIC investments.

62.     CABOT INVESTMENT required Plaintiffs and the Class to purchase their TIC interest from one or more of CABOT INVESTMENT's wholly owned subsidiaries through a Delaware limited liability company (collectively, the "TIC LLCs") formed in advance by CABOT INVESTMENT.  There could be as many as 35 TIC investors, and thus 35 TIC LLCs, for each TIC investment.

63.     For example, one of the TIC investments that is the subject of this Complaint comprise two commercial office buildings located at 100 and 110 East Broward Boulevard in Fort Lauderdale, Florida.   For that TIC investment, the Delaware LLCs are individually numbered and start with Cabot East Broward 1, LLC, continuing sequentially up to and including Cabot East Broward 35, LLC, thus creating 35 Delaware LLCs each with a unique name.  As individual TIC investors agreed to invest, CABOT INVESTMENT assigned the next available numbered TIC LLC to the investor.

**The Six Florida Properties**

64.     This action arises in connection with six TIC investments in Florida offered by CABOT.  Plaintiffs and the Class are investors in one or more of these TIC investments.  The six Florida properties – East Broward, Oak Grove, North Orange, Trafalgar/Avion, Cypress Creek, North University – are described below and are collectively referred to herein as the "Florida Properties."

65.     In total, Plaintiffs and the Class invested approximately $156,770,000 in principal to purchase the Florida Properties.  Most of that principal has been lost due to completed

foreclosures caused by the DEFENDANTS' conduct.  What has not already been lost is currently at risk of loss due to pending foreclosure proceedings.

### East Broward

66.     East Broward is comprised of two commercial buildings located at 100 and 110 East Broward Boulevard, Fort Lauderdale, Florida 33301.  East Broward is a Class A, 24-story office building, including a retail annex, of approximately 342,465 square feet.

67.     The property was purchased by Cabot East Broward Acquisition, LLC in or about March 28, 2006 for approximately $62.2 million.[2]  The purchase was financed by a $40 million mortgage and approximately $20.98 million in principal, with $14.95 million of that principal reserved for the purchase of real estate.

68.     There are as many as 35 TIC investors in East Broward, beginning with Cabot East Broward 1, LLC continuing sequentially up to and including Cabot East Broward 35, LLC, including Plaintiffs East Broward 2 and East Broward 34.

69.     Plaintiff Patricia D. Souza is a TIC investor in East Broward.

70.     As set forth in greater detail below, CABOT and KROLL embezzled approximately $3,001,883.00 from East Broward's operating account from in or about 2008 through and including July 16, 2012.

71.     HERNANDEZ managed East Broward from January 2008 to January 2011 while employed by CBRE.

72.     In 2012, the acquisition loan went into default for non-payment of the monthly mortgage and on or about February 15, 2013, U.S. Bank National Association moved to and was granted leave to intervene in a pending lawsuit in Circuit Court in Broward County, Florida to file a foreclosure action against the property.  The case is currently pending under Broward County Circuit Court Case No. CACE 12-021902 (04).

### North Orange

---

[2] Allegations in the Complaint regarding the Florida Properties' initial purchase price, the amount of capital raised by the sponsor, the amount of the mortgage, and any other financial information regarding the purchase, sale, and foreclosure of the Florida Properties are derived from, *inter alia*: (i) U.S. Securities and Exchange Commission filings; (ii) public records, including Property Appraiser reports and foreclosure case filings; (iii) private placement memoranda provided by CABOT INVESTMENT to TIC investors; and (iv) public websites, such as business journals and property search services.

73.     North Orange is a commercial building located at 20 North Orange Avenue, Orlando, Florida 32801.   It is a Class B, 16-story office building and 7-story garage of approximately 267,398 square feet.

74.     North Orange was purchased by Cabot North Orange Acquisition, LLC in or about October 2005 for approximately $55.35 million.  The purchase was financed by a $42.7 million mortgage. The North Orange TIC investors invested $64.6 million in principal. Approximately $58.8 million of the $64.6 million was used to purchase North Orange.

75.     There are as many as 35 TIC investors for North Orange, beginning with Cabot North Orange 1, LLC continuing sequentially up to and including Cabot North Orange 35, LLC.

76.     As set forth in greater detail below, CABOT and KROLL embezzled approximately $2,480,394.00 from North Orange from in or about 2008 through and including 2012.

77.     On or about January 13, 2012, the lender, U.S. Bank National Association, filed a foreclosure action against North Orange in Orange County, Florida, Circuit Court under Case No. 2012-CA-000665-O.

78.     On or about August 4, 2014, the parties to the foreclosure entered into a settlement and North Orange was sold for approximately $34.75 million, resulting in a total loss of the TIC investors' principal investment.

### *Oak Grove*

79.     Oak Grove is an office park located at 7575, 7585, and 7595 Baymeadows Way, Jacksonville, Florida 32256.  It consists of four suburban and industrial Class B buildings sitting on 51 acres.

80.     Oak Grove was purchased by Cabot Oak Grove Acquisition, LLC on or about December 29, 2006 for approximately $17.7 million.  The purchase price was financed by a $14.75 million mortgage.  The Oak Grove TIC investors invested approximately $8.65 million in principal.  Approximately $6.1 of the $8.65 million was used to purchase Oak Grove.

81.     There are 27 TIC investors for Oak Grove, beginning with Cabot Oak Grove 1, LLC continuing sequentially up to and including Cabot Oak Grove 27, LLC.

82.     As set forth in greater detail below, CABOT and KROLL embezzled approximately $1,484,695.00 from Oak Grove from in or about 2008 through and including 2012.

83.     On or about January 16, 2013, a foreclosure action was filed in the Duval County, Florida Circuit Court against Oak Grove by the lender, LBUBS 2007-C1 Baymeadows Office, LLC, where it remains pending under Case No. 16-2013-CA-000504-XXXX-MA.

***Trafalgar/Avion***

84.     Trafalgar/Avion is comprised of two commercial buildings located at 5300 N.W. 33rd Avenue, Fort Lauderdale, Florida 33309 and 2200 N.W. 50th Street, Fort Lauderdale, Florida 33309.  The former is approximately 25,110 square feet and the latter is approximately 68,895 square feet.  Both buildings are Class B office buildings.

85.     Trafalgar/Avion was purchased by Cabot Trafalgar/Avion Acquisition, LLC in or about February 2006 for approximately $25.55 million.  The purchase was financed by a $20.44 mortgage.  The North Orange TIC investors invested approximately $10.7 million in principal.  Approximately $7.7 million of the $10.7 was used to purchase Trafalgar/Avion.

86.     There are 35 TIC investors for Trafalgar/Avion, beginning with Cabot Trafalgar/Avion 1, LLC continuing sequentially up to and including Cabot Trafalgar/Avion 35, LLC.

87.     As set forth in greater detail below, CABOT and KROLL embezzled approximately $936,635.00 from Trafalgar/Avion from in or about 2008 through and including 2012.

88.     On or about December 27, 2012, a foreclosure action was filed in the Broward County, Florida Circuit Court against Trafalgar/Avion by DMARC 2006-CDS Broward Facilities LLC under Case No. CACE12035629.  Final Judgment of foreclosure was entered in favor of the lender on or about March 27, 2014.

89.     On or about May 28, 2014, the lender purchased the properties at the foreclosure sale for a minimum credit bid of $100.00, resulting in a total loss of the TIC investors' principal investment.

***Cypress Creek***

90.     Cypress Creek is a commercial building located at 800 West Cypress Creek Road, Fort Lauderdale, Florida 33309.  It is a Class B, five-story office building of approximately 62,476 square feet.

91.     Cypress Creek was purchased in or about July 8, 2005 by Cabot Cypress Creek Acquisition, LLC for approximately $8.6 million.  The purchase was financed by a $6.45 million

mortgage.  The Cypress Creek TIC investors invested approximately $10.95 million in principal.  Approximately $9.53 million of the $10.95 million was used to purchase Cypress Creek.

92.    There are 18 TIC investors for Cypress Creek, beginning with Cypress Creek 1, LLC continuing sequentially up to and including Cypress Creek 18, LLC.

93.    As set forth in greater detail below, CABOT and KROLL embezzled funds from Cypress Creek from in or about 2008 through and including 2012.

94.    On or about January 10, 2013, a foreclosure action was filed in Broward County Circuit Court against Cypress Creek by GCCFC 2005-GG5 Fort Lauderdale Office, LLC under Case No. CACE-13-000791.

95.    On or about October 9, 2013, GCCFC 2005-GG5 Fort Lauderdale Office, LLC purchased Cypress Creek for $2,000,100, resulting in a total loss of the TIC investors' principal investment.

96.    Final Judgment was entered for GCCFC 2005-GG5 Fort Lauderdale Office, LLC on or about October 14, 2015.

97.    In or about July 2015, Cypress Creek was sold for $6.04 million.

*North University*

98.    North University is a commercial building located at 3111 North University, Coral Springs, Florida 33065.  It is a Class A, 10-story office building of approximately 298,762 square feet.

99.    The building was purchased in March 2005 by Cabot North University Acquisition, LLC for approximately $36,192,500.  The purchase was financed by a $25 million mortgage.  The North University TIC investors invested approximately $40.9 million in principal.  Approximately $36.2 million of the $40.9 million was used to purchase North University.

100.    There are as many as 29 TIC investors for North University, beginning with Cabot North University 1, LLC continuing sequentially up to and including Cabot North University 29, LLC.

101.    As set forth in greater detail below, CABOT and KROLL embezzled funds from North University from in or about 2008 through and including 2012.

102.    On or about April 4, 2012, the lender, U.S. Bank National Association, filed a foreclosure action in Broward County, Florida, Circuit Court under Case No. CACE12010051.

103.    Final Judgment of foreclosure was entered for the lender on October 8, 2012.

104.    On November 8, 2012, North University was sold in a foreclosure sale for $12.6 million, resulting in a total loss of the TIC investors' principal investment.

**The Master Lease and Property Management Agreements**

105.    In their capacity as owners of the real estate, Plaintiffs and the Class entered into a Master Lease Agreement or Asset Management Agreement with a CABOT INVESTMENT subsidiary as the lessee for the Florida Properties.  The relevant master lessees are BROWARD LEASECO for East Broward, NORTH ORANGE LEASECO for North Orange, OAK GROVE MANAGER for Oak Grove, TRAFALGAR/AVION LEASECO for Trafalgar/Avion, CYPRESS CREEK LEASECO for Cypress Creek, and NORTH UNIVERSITY LEASECO for North University (collectively, the "FLORIDA MASTER LESSEES").

106.    The FLORIDA MASTER LESSEES, in turn, sub-leased the parcels or units within the Florida Properties to tenants as sub-lessees.  The FLORIDA MASTER LESSEES also entered into standard form management agreements with CBRE (the "Property Management Agreements") under which CBRE was responsible for managing the Florida Properties.  An exemplar Property Management Agreement for East Broward is attached hereto as Exhibit A.

107.    The Master Lease Agreements and the Property Management Agreements served a critical function – they removed and insulated Plaintiffs and the Class from any and all management functions, thereby protecting the passive nature of the TIC investment for tax purposes.  At the same time, this left Plaintiffs and the Class entirely dependent upon CABOT, KROLL, the FLORIDA MASTER LESSEES, and CBRE to duly carry out their performance and payment obligations under the Property Management Agreements and documents incorporated into the Property Management Agreements that are described below.

108.    CBRE began managing the Florida Properties no later than March 12, 2007 and continued managing them until January 2011.

109.    The Property Management Agreements for the Florida Properties are nearly identical and all contain the following provisions:

        a.    CBRE acknowledges that the true parties in interest are the TIC investors, *i.e.*, Plaintiffs and the Class, who are variously referenced in the agreements as the "legal title holders of the Property" or "the tenant in common fee owners of the Property;"

b.      CBRE acknowledges that the relationship between Plaintiffs, the Class, the FLORIDA MASTER LESSEES, and the mortgage lenders are governed by the various agreements between the parties, which CBRE acknowledges receiving before commencing management of the Florida Properties, including the Mortgage, Assignment of Leases and Rents, Cash Management Agreement, and Lockbox Agreement (collectively referred to in the Property Management Agreements and herein as the "Loan Documents") that controlled the deposit and disposition of all rents derived from the Florida Properties, as described further below; and

c.      The FLORIDA MASTER LESSEES authorizes CBRE to manage the Florida Properties subject to the provisions of the Loan Documents.

110.    The Property Management Agreements further obligated CBRE to manage all facets of the financial performance of the Florida Properties including:

a.      Preparation and submission of an annual operating and capital budget for the operation, repair, and maintenance of the Florida Properties;

b.      Delivery of monthly financial reports to the FLORIDA MASTER LESSEES regarding the actual performance of the Florida Properties against the budget;

c.      Preparation of accurate accounting records on a monthly basis including a balance sheet, operating statement, rents rolls, general ledger, and other financial details;

d.      Collection of rents for deposit to the bank account which was to be used in strict conformance with the Loan Documents**;**

e.      As agent for the Florida Master Lessee, drawing on the Leasee's bank account in accordance with the provisions of the Loan Documents and the Property Management Agreement, including the budget, which constituted authorization to expend necessary monies to manage and operate the properties, including payment of all charges normally incurred monthly and any other amounts payable by the 15th of the month; and

f.      Performance of all other services required to manage, operate, and maintain the Florida Properties.

111.    CBRE knew that Plaintiffs and the Class were highly dependent on CBRE to safeguard their investments because as TIC investors, Plaintiffs and the Class were prohibited from actively managing the Florida Properties or becoming involved in its affairs due to IRS rules governing TIC investments.

112.    For its part, each the FLORIDA MASTER LESSEES were obligated to maintain adequate funds in its bank account for all approved expenditures to be made by CBRE.

113.    CBRE was entitled to payment of a monthly management fee for each of the Florida Properties in an amount equal to the greater of a specified flat fee or a percentage of gross revenues.

114.    CBRE stopped managing the Florida Properties by January 2011, because the FLORIDA MASTER LESSEES were not paying all of CBRE's fees and expenses.

**The Cash Management and Lockbox Agreements**

115.    Plaintiffs, the Class, and the FLORIDA MASTER LESSEES all entered into Cash Management Agreements and Lockbox Agreements with each of the lenders that financed the acquisition of the Florida Properties.  These agreements were required by the mortgage lenders to insure that tenant rents were applied on a prioritized basis to both keep the loans current and the property expenses paid.

116.    The Cash Management Agreements governed the collection and disbursement of rents generated by the Florida Properties.  Under the agreements, the FLORIDA MASTER LESSEES were required to cause tenants to remit their rents directly into a "clearing account" with a servicing bank.  After the funds in that account cleared, they were to be swept daily into a "lockbox" account with a second servicing bank pursuant to the Lockbox Agreements.  The second servicing bank was then required to disburse rents out of the lockbox on a monthly basis in accordance with a payment priority "waterfall" as follows:

a.      First to the mortgage lender for payment of the mortgage;

b.      Second to funding of various reserve accounts relating to the mortgage including reserves for insurance and taxes;

c.      Third to the respective Florida Master Lessee for payment of the ground rent;

d.      Fourth to the respective FLORIDA MASTER LESSEES for payment of the property expenses, to fund the budget for monthly operating expenses for the Florida Properties, and to pay the TIC investors' base rents; and

e.      Fifth and last, and provided that the loan was not in default or potential default, then any excess remaining balance to be remitted to the respective FLORIDA MASTER LESSEES.

18

117.    The Cash Management and Lock Box Agreements prohibit any party other than the servicing banks from having access to the monies in the clearing account or the lockbox account.  In addition, pursuant to the terms of the Property Management Agreements between the FLORIDA MASTER LESSEES and CBRE, CBRE is the party authorized to disburse funds from the respective operating accounts for payment of all property expenses.  Consequently, monies disbursed from the lockbox waterfall "to the FLORIDA MASTER LESSEES" for payment of the property expenses was in fact monies that were required to be deposited into the properties' respective operating accounts and used by CBRE to pay the property expenses, the ground rent, and the TIC's base rents prior to the FLORIDA MASTER LESSEES obtaining access to those funds.

**The Principal-Agent and Sub-agent Relationship Created by the TIC Investment Structure, Master Lease Agreements, and Property Management Agreements**

118.    At all relevant times, there was a principal-agent relationship between Plaintiffs and the Class as principals and Defendants CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES as agents (collectively the "Agents").  The principal-agency relationship was created by the structure of the TIC investments sponsored by CABOT INVESTMENT which required Plaintiffs and the Class to place complete control and authority over the properties they owned, and the cash proceeds thereof, into the hands of the Agents.  In doing so, Plaintiffs and the Class placed trust and confidence in the Agents and the Agents accepted that trust and confidence.

119.    Plaintiffs and the Class, as the actual owners of the Florida Properties underlying the TIC investments, had the ultimate right to control the FLORIDA MASTER LESSEES' actions and decisions.

120.    Among other things, the scope of the agency included managing the Florida Properties, leasing space in the Florida Properties to prospective tenants, and ensuring that funds generated from the Florida Properties were properly distributed and accounted for according to the Loan Documents, including paying base rents to Plaintiffs and the Class, and providing Plaintiffs and the Class with accurate Investor Reports.

121.    At all relevant times, CBRE acted as a sub-agent to the FLORIDA MASTER LESSEES.

19

122.     A sub-agent is one appointed by an agent to perform the functions of the agent under the primary control of the agent.  The subagent is the agent of both the appointing agent (the FLORIDA MASTER LESSEES) and the principal (Plaintiffs and the Class).

123.     CBRE was retained by Plaintiffs and the Class' Agents to perform duties within the scope of Defendants CABOT, KROLL, CABOT INVESTMENTS, and/or the FLORIDA MASTER LESSEES' agency.   Those duties are set forth in the Property Management Agreements and the Loan Documents by incorporation.

124.     CBRE was under the primary control of the Agents.

125.     CBRE knew that Plaintiffs and the Class owned the Florida Properties.  CBRE also knew that the Agents' authority to retain CBRE arose from the Master Lease.

126.     Because CBRE knew that Plaintiffs and the Class were the ultimate principals, CBRE, as sub-agents, owed Plaintiffs and the Class the duties owed by the FLORIDA MASTER LESSEES to Plaintiffs and the Class.

127.     Furthermore, CBRE, as a sub-agent to the Agents, is liable to Plaintiffs and the Class for participating in a breach of duty by the agent to the principal because CBRE had notice that the agent's conduct constituted a breach of duty to Plaintiffs and the Class.

**Federal Criminal Charges Are Filed – CABOT and KROLL Enter Guilty Pleas**

128.     On or about June 1, 2015, a Criminal Complaint ("Crim. Compl.") was filed by the United States of America in United States District Court for the Southern District of New York against CABOT and KROLL, charging them both with seven federal offenses all in connection with an alleged $16,909,480.71 embezzlement from several CABOT INVESTMENT TIC investments from 2008 through 2012, including the Florida Properties.  (Crim. Compl. ¶¶ 1-19, 21-32, 44).   The Criminal Complaint is attached hereto as Exhibit B.   Of the alleged $16,909,480.71 embezzled, approximately $7,903,609.46 was embezzled from four of the six Florida Properties as follows:

          a.     $3,001,883.69 embezzled from East Broward, (*id.* ¶ 44);

          b.     $2,480,394.49 embezzled from North Orange, (*id.*);

          c.     $1,484,695.66 embezzled from Oak Grove, including $31,500 embezzled on or about October 28, 2010 (*id.* ¶ 32(a)); and

          d.     $936,635.62 embezzled from Trafalgar/Avion, (*id.* ¶ 44).

129.     The Criminal Complaint further alleges that:

a.      CABOT and KROLL embezzled an unspecified sum of money from the other two Florida Properties, North University and Cypress Creek (Crim. Compl. ¶ 32(d)(i)-(ii));

b.      On or about July 15, 2011, CABOT and KROLL embezzled approximately $230,000 in multiple bank account transfers from five TIC investments, including North University and Trafalgar/Avion (*id.* ¶ 32(d)(i)); and

c.      On or about October 14, 2011, CABOT and KROLL embezzled approximately $247,000 in multiple bank account transfers from seven TIC investments, including Cypress Creek, North Orange, and Trafalgar/Avion (*id.* ¶ 32(d)(ii)).

### *The Flow of Funds and the Embezzlement*

130.    As set forth in the Criminal Complaint, CABOT INVESTMENT maintained a bank account for each TIC investment referred to in the Criminal Complaint as a "TIC Bank Account." (Crim. Compl. ¶ 17(b)).  Funds deposited into the TIC Bank Accounts should have been disbursed in accordance with the priorities set forth in the Master Lease Agreements, Cash Management Agreements, and other binding agreements described in this Complaint.

131.    Instead, from 2008 through and including 2012, CABOT and KROLL embezzled approximately $16.9 million from various TIC investments, including $7.9 million from the Florida Properties, by diverting funds from the TIC Bank Accounts into accounts that they controlled, referred to in the Criminal Complaint as the "CIP Operating Accounts."  (Crim. Compl. ¶¶ 3(a)-(c) 13-14, 17(b)-(c), 22-22(c), 27(a), 27(c), 27(e), 28(a), 28(d), 31, 32 , 43(b)).

132.    CABOT and KROLL perpetrated the embezzlement by stealing funds that should have been used to pay base rents to Plaintiffs and the Class, funds that should have been used to pay operating expenses for the Florida Properties, and funds that should have been used to make mortgage payments.  (Crim. Compl. ¶ 27(a)).

133.    CABOT and KROLL used the millions they embezzled to support their luxurious lifestyles, spending the purloined funds on expensive cars, luxury apartments in New York City, and private school tuitions for their children.  (Crim. Compl. ¶ 22(b)).

134.    Plaintiffs and the Class, however, were unaware they were being defrauded. Plaintiffs and the Class exercised due care and diligence in seeking to discover the facts that form the basis for this Complaint but were thwarted by DEFENDANTS' fraudulent conduct and omissions.  DEFENDANTS, through a series of affirmative acts and/or omissions described herein, suppressed the dissemination of truthful information regarding their illegal conduct and

actively prevented Plaintiffs and the Class from learning of their illegal and/or tortious acts. DEFENDANTS' conduct was, by its nature, self-concealing and carried out in a manner that precluded detection.

### *CABOT and KROLL Enter Guilty Pleas*

135.     On October 7, 2015, KROLL pled guilty in U.S. District Court for the Southern District of New York to all seven counts of an Information charging him with conspiracy to commit securities fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, securities fraud, wire fraud, money laundering, and illegal monetary transactions, all in connection with the alleged embezzlement from several TIC investments, including the Florida Properties.  Although the Information contains criminal forfeiture allegations, there are no specific assets identified in the Information as potentially forfeitable.

136.     KROLL's sentencing is currently scheduled for July 19, 2016 in U.S. District Court for the Southern District of New York.

137.     On October 7, 2015, a federal Grand Jury in the Southern District of New York returned a seven count Superseding Indictment against CABOT.  Although the Superseding Indictment contains criminal forfeiture allegations, there are no specific assets identified as potentially forfeitable in the Superseding Indictment.

138.     On May 31, 2016, CABOT entered a plea of guilty to one count of securities fraud which alleged that "CABOT misappropriated funds belonging to the TIC Investments knowing that such misappropriations were concealed through false and misleading financial reports and other false and misleading information provided to TIC investors."

139.     CABOT's sentencing is currently scheduled for September 15, 2016 in United States District Court for the Southern District of New York.

### CBRE and HERNANDEZ Knew that CABOT and KROLL Were Embezzling Millions from the Florida Properties but Failed to Alert Plaintiffs and the Class

140.     There are at least three reasons that CBRE and HERNANDEZ knew that CABOT and KROLL were embezzling from the Florida Properties.

141.     *First*, under the Property Management Agreements, CBRE was responsible for managing and reporting on cash flows to and from the Florida Properties.  CBRE specifically undertook to perform those duties in conformance with the rights and responsibilities set forth in the Loan Documents, including the Cash Management Agreements and the Lockbox

Agreements.  CBRE was also responsible for managing each of the Florida Properties' operating accounts and ensuring that all expenses pertaining to the properties were timely paid including payment of the ground lease, the base rents due the TIC investors, and the property operating expenses.

142.    Despite these duties and obligations, CBRE and HERNANDEZ allowed CABOT and KROLL to obtain signatory power to the operating accounts, and witnessed CABOT and KROLL making improper transfers from the accounts to CABOT's own operating accounts, even as base rents, real estate taxes, vendor invoices, and various other operating expenses went unpaid.  Not only were CBRE and HERNANDEZ aware of the embezzlements as they occurred, they documented the events in financial reporting to the embezzlers.

143.    *Second*, property managers who managed other TIC properties sponsored by the CABOT INVESTMENT that employed the same structure and agreements described in this Complaint **knew in real-time** that CABOT and KROLL were misappropriating and/or embezzling funds from the properties' respective operating accounts.  As described in the Criminal Complaint, CABOT and KROLL's embezzlement "caused problems" for the property managers.  (Crim. Compl. ¶ 27 (d)).  "On several occasions, individual Property Managers called [a CABOT INVESTMENT employee] to complain that they had no funds available to cover the operating expenses of the property and to inquire about where the money in the accounts had gone."  (*Id.*).

144.    At least two TIC property managers have given sworn testimony to federal law enforcement agents that CABOT and KROLL were either misappropriating or embezzling funds from the properties that they managed.  For example, the Criminal Complaint refers to "Property Manager 1," likely a property manager for CABOT INVESTMENT TIC investments in Ohio.  The Criminal Complaint states that, "On more than one occasion, Property Manager 1 sent CABOT and KROLL an email detailing the amount of money that had been deposited in the property account and the specific bills that Property Manager 1 intended to pay.  After sending the emails, the money was withdrawn from the property account shortly thereafter."  (Crim. Compl. ¶ 30(b)).

145.    It took Property Manager 1 no time after the embezzlement began to realize what was happening.  **Property Manager 1 realized in 2009 that CABOT and KROLL were embezzling or misappropriating funds**.  (Crim. Compl. ¶ 30)(e)).

146.     An unnamed CABOT INVESTMENT TIC property manager in North Carolina, with whom Property Manager 1 spoke because the North Carolina TIC investment received money from the TIC that Property Manager 1 managed, also knew there was a problem.  The unnamed North Carolina property manager "indicated that he, too, was having trouble paying the operating expenses of the property he managed, despite the property being fully leased." (Crim. Compl. ¶ 30(f)).

147.     "Property Manager 2," also cited in the Criminal Complaint, "**corroborated the pattern of withdrawals from the TIC property accounts to the CIP Operating Accounts that Property Manager 1 described**." (Crim. Compl. ¶ 31) (emphasis added).  In fact, Property Manager 2 corroborated that CABOT and KROLL owed millions of dollars to four of the six Florida Properties – East Broward, North Orange, Oak Grove, and Trafalgar/Avion – by or in 2012. (*Id.*).

148.     Property Manager 2 was likely an employee of CBRE involved with the management of the Florida Properties and may, in fact, be HERNANDEZ.

149.     In 2014, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts also investigated CABOT, KROLL, and CABOT INVESTMENT for embezzling millions of dollars from eight TIC investments, including Oak Grove and Trafalgar/Avion.  The Securities Division filed an Administrative Complaint against CABOT, KROLL, and CABOT INVESTMENT on June 18, 2014 (the "Massachusetts Administrative Complaint"), a copy of which is attached hereto as Exhibit C.

150.     The Securities Division took testimony from an unidentified property manager. Like the property managers relied upon by the U.S. Attorney's Office in the Criminal Complaint, the property manager quoted in the Massachusetts Administrative Complaint admitted that they knew CABOT and KROLL were misappropriating or embezzling money from the TIC they managed.  According to the Massachusetts Administrative Complaint, a property manager testified as follows:

> WITNESS:  Specifically what we found was that first there was a period of time during which **Mr. Cabot did not turn over access to the bank accounts to us so he was the only one who had access to the bank accounts; then after he turned access over to us he still had access**, which he had to have because he was still the formal lender-approved manager of the property, but what we

found was that they would query the bank accounts frequently and if there was money in the bank accounts they swept it out . . .

So shortly after we took over the asset and property management we realized that **CIP was still taking money out of these accounts** where, first of all, the money wasn't supposed to go in those accounts, **it was supposed to go in the lock box accounts** and, second of all, **they shouldn't have been taking it and that was in violation very explicitly of our submanagement contracts**.

(Emphasis in original).

151.    *Third*, and most telling, it took just **one month** for another property management company ("Property Manager A"), who took over management of East Broward in July 2012, **to realize and report to the East Broward TIC investors** that:  (i) EAST BROWARD LEASECO was not complying with the Lockbox Agreement; (ii) Property Manager A, not EAST BROWARD LEASECO, should have exclusive control to the East Broward bank accounts; and (iii) most importantly, **EAST BROWARD LEASECO withdrew $1,550,455.00 in "unaccounted for" funds between January 11, 2011 and July 16, 2012**.

152.    Property Manager A found that CABOT and KROLL embezzled $58,400 from East Broward in July 2012 alone, as follows:  $10,000 on July 2, 2016; $18,400 on July 3, 2012; $15,000 on July 6, 2012; $4,000 on July 10, 2012; $5,000 on July 12, 2012; and $6,000 on July 16, 2012.

153.    It is unknown why Property Manager A chose January 2011 as a starting point for its search for "unaccounted for" withdrawals from East Broward, but that month coincides with CBRE's termination of its management role in connection with the Florida Properties. According to the Criminal Complaint, CABOT and KROLL embezzled approximately $3,001,883.69 from East Broward from in or about 2008 through and including July 16, 2012. Property Manager A, therefore, only found a little more than half of the embezzled funds in its search for the missing money.  The other $1,451,428 embezzled by CABOT and KROLL was embezzled prior to January 2011, the period when CBRE and HERNANDEZ were responsible for managing the property.

154.    Despite CBRE and HERNANDEZ's contemporaneous, actual knowledge of the ongoing embezzlements, and their knowledge of Plaintiffs and the Class Members' dependence on CBRE as the Property Manager to ensure that the income from the property was applied first

to pay the expenses of the property, including the TIC investors' base rents, CBRE and HERNANDEZ failed to alert Plaintiffs or any member of the Class of the on-going, multi-year embezzlement from the Florida Properties.

155. Once the embezzlement began, the Florida Properties were deprived of funds for routine maintenance and improvements needed to attract for commercial tenants in a competitive market. As a result, it became increasingly difficult to find new tenants for the Florida Properties, which deprived Plaintiffs and the Class of needed rents that would have been used to pay the mortgage lender, further contributing to the eventual foreclosure of the Florida Properties.

156. CBRE, however, collected management fees, reimbursement for expenses, and leasing commissions for the Florida Properties while the embezzlement was ongoing.

157. Had CBRE or HERNANDEZ notified Plaintiffs and the Class Members that CABOT and KROLL were embezzling money from the Florida Properties, Plaintiffs and the Class could have taken legal action to stop the embezzlement, including, but not limited to alerting law enforcement. Had CBRE or HERNANDEZ notified Plaintiffs and the Class about the embezzlement, Plaintiffs and the Class could have taken steps to prevent a default on the Florida Properties' mortgages by, among other things, replacing the FLORIDA MASTER LESSEES, preventing the diversion of rents, seeking refinancing, and/or suspending payments of base rents/distributions and applying those funds towards paying the mortgages.

**CBRE and HERNANDEZ Affirmatively Helped Facilitate and Conceal the Embezzlement**

158. CBRE and HERNANDEZ helped CABOT and KROLL perpetuate and conceal the embezzlement from the Florida Properties by preparing and transmitting to CABOT INVESTMENT and the FLORIDA MASTER LESSEES false and fraudulent financial reports for the Florida Properties that KROLL used to create false and misleading Investor Reports. CBRE's financial reports were false and misleading because they did not accurately describe or account for the millions of dollars that CABOT and KROLL were misappropriating and embezzling from the Florida Properties.

159. HERNANDEZ also had direct communications with East Broward TIC investors. HERNANDEZ spoke with East Broward TIC investors by phone, and met with at least one investor in person, to discuss East Broward's financial problems. HERNANDEZ never mentioned in any of those conversations or meetings that CABOT and KROLL were embezzling

funds from East Broward.  Instead, HERNANDEZ facilitated and concealed the embezzlement by leading the East Broward TIC investors to believe that East Broward's financial struggles were caused by things other than an ongoing embezzlement.

160.    By January 2011, CBRE had ceased managing the Florida Properties.  CBRE quit because CABOT and KROLL were not paying CBRE's management fees and expenses.  In fact, CBRE sued the FLORIDA MASTER LESSEES for $2,435,659.10 for unpaid management services, commissions, and/or reimbursable expenses for the Florida Properties.

161.    Upon information and belief, CBRE and HERNANDEZ willfully turned a blind eye to the embezzlement and helped facilitate and conceal the embezzlement because they knew that exposing the embezzlement would likely compromise CBRE's source of payment.  CBRE and HERNANDEZ thus chose not to raise an alarm about the embezzlement and decided to help CABOT and KROLL perpetuate and conceal the embezzlement for CBRE's own pecuniary gain.

**SILVERMAN Facilitated the Embezzlement, Helped Conceal the Embezzlement,
and Failed to Alert Plaintiffs and the Class to the Embezzlement**

162.    As explained in the Criminal Complaint, from in or about 2003 through and including 2012, SILVERMAN provided accounting services, including reviewing Investor Reports for the Florida Properties before they were sent to Plaintiffs and the Class.  (Crim. Compl. ¶ 37(f)).

163.    In or about January 2010, while SILVERMAN was providing accounting services to CABOT INVESTMENT and the FLORIDA MASTER LESSEES, SILVERMAN became a Managing Director at ACTUARIAL RISK.

164.    SILVERMAN describes himself on LinkedIn as a "[f]inancial and business executive with over 35 years senior level experience in syndication and structuring of real estate and business ventures, corporate tax planning, and income and estate planning for high net-worth families."

165.    At various points in his career, SILVERMAN was the head of the Tax Department at Grant Thornton in Boston, Massachusetts; head of the Northeastern Real Estate practice for Coopers & Lybrand; and a tax partner at BDO Seidman, LLP.

166.    From November 6, 1970 through June 30, 2008, SILVERMAN was a licensed Certified Public Accountant in Massachusetts.

27

167.   SILVERMAN played a critical role in causing injury to Plaintiffs and the Class. As set forth below and in the Criminal Complaint, SILVERMAN knew CABOT and KROLL were embezzling millions of dollars from the Florida Properties and other TIC investments. SILVERMAN, however, not only kept quiet about the embezzlement, he helped CABOT and KROLL continue and conceal the embezzlement from Plaintiffs and the Class by helping to create false and fraudulent Investor Reports.

168.   Despite SILVERMAN's prominent role in the embezzlement, he was not criminally prosecuted.  In fact, he received federal "use immunity" for his testimony.

169.   SILVERMAN knew, no later than January 28, 2010, that CABOT INVESTMENT was hemorrhaging money.  As set forth in the Criminal Complaint, on January 28, 2010, SILVERMAN wrote a letter addressed to the bank that held a mortgage on CABOT's personal residence seeking a short sale of CABOT's property.  (Crim. Compl. ¶ 34).  The letter stated that the TIC properties had not generated revenue for CABOT INVESTMENT since 2008. (*Id.*)  It further stated that CABOT INVESTMENT lost $7.7 million in 2008 and $4.5 million in 2009.  (*Id.*)  SILVERMAN therefore knew that the millions of dollars that CABOT and KROLL were diverting from the Florida Properties to CABOT and KROLL's accounts for their personal use were not legitimately earned income, but were the proceeds of fraud, a multimillion dollar embezzlement.

170.   SILVERMAN knew that KROLL was manipulating the Investor Reports to hide losses from Plaintiffs and the Class stemming from a multi-million dollar embezzlement scheme.

171.   For example, in late 2009, SILVERMAN approached KROLL after KROLL sent SILVERMAN a draft balance sheet for Oak Grove that KROLL intended to include in the Oak Grove Investor Report.  KROLL had crossed out two line items reflecting money owed by CABOT INVESTMENT to the Oak Grove investors.  SILVERMAN asked KROLL why he deleted the line items and KROLL told SILVERMAN that the balance sheet could not reflect the sums owed by CABOT INVESTMENT to the Oak Grove investors.  (*See* Crim. Compl. ¶ 37(h)).

172.   On at least two occasions, an employee of CABOT INVESTMENT recalled KROLL **asking SILVERMAN how to manipulate Investor Reports to hide amounts owed by CABOT INVESTMENT to Plaintiffs, the Class, and others**.  (*See* Crim. Compl. ¶ 37(e)).

173.   The Criminal Complaint gives the following examples of how KROLL and SILVERMAN falsely and fraudulently manipulated the Investor Reports.

a.     CABOT and KROLL embezzled approximately $212,400 from an Ohio TIC investment in early 2011.  KROLL, however, did not include or make any reference to the missing $212,400 in any Investor Report for that TIC investment.  (Crim. Compl. ¶38(a)-(b)).  Instead, to continue and conceal the embezzlement, KROLL falsely and fraudulently manipulated and altered the balance sheet by attributing $212,400 in phantom deposits to other items in the financial statement, such as "Account Receivable" and "Security Deposit Escrow." (*Id.*).

b.     CABOT and KROLL also embezzled $3,304,053 from a TIC in Connecticut.  (Crim. Compl. ¶¶ 37(h)-(i), 38(c)-(d)).  The embezzled funds were concealed in the Investor Reports by increasing a reserve called "Lender Tenant Imp/Leasing Escrow" by $2,844,886 and attributing $412,391 to an account called "Other Reserve," even though there were no such deposits into those reserves.  (*Id.*).  KROLL and SILVERMAN also fraudulently decreased "Accrued Expenses" by $46,776.  (*Id.*).  The net effect of these three fraudulent accounting maneuvers was to balance the balance sheet for the Connecticut TIC investment. (*Id.*).

174.    KROLL and SILVERMAN employed similar false and fraudulent accounting entries for the Florida Properties Investor Reports.  (Crim. Compl. ¶ 38(e)).

175.    On July 1, 2011, for example, KROLL sent via email to the East Broward investors, including at least one investor who resided in Florida, copies of Investor Reports for the First Quarter of 2011 and the Year-End 2010 Report.  Neither Investor Report disclosed that CABOT and KROLL had been misappropriating or embezzling funds from East Broward during the time period covered by the Investor Reports.  Instead, the Investor Reports painted a false and misleading financial picture for East Broward making it appear that market forces, rather than the embezzlement, were to blame for East Broward's slumping financial performance.

176.    Had SILVERMAN warned Plaintiffs and the Class that CABOT and KROLL were embezzling money from the Florida Properties, Plaintiffs and the Class could have taken legal action to stop the embezzlement, including, but not limited to alerting law enforcement. Plaintiffs and the Class also could have taken steps to prevent a default on the Florida Properties' mortgages, such as, among other things, replacing the FLORIDA MASTER LESSEES, seeking refinancing, and/or suspending payments of base rents and applying those funds towards paying the mortgage.

CLASS ACTION ALLEGATIONS

**Class Definition**

177.    The proposed Class is defined as all TIC investors in the Florida Properties.

178.    Excluded from the proposed Class are:

   a.    Any employee of the Court;

   b.    DEFENDANTS and any of their respective subsidiaries, affiliates, officers, and directors;

   c.    Any entity in which any DEFENDANTS have any controlling or ownership interest; and

   d.    The legal representatives, heirs, successors, family members, and assigns of any such excluded party.

179.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether to certify the Class.

**The Proposed Class Is So Numerous that Joinder of All Members is Impracticable**

180.    The Class is so numerous that joinder of all members would be impracticable. Based on filings with the SEC, there are as many as 179 authorized TIC investors for the Florida Properties.   Joinder is furthermore impracticable because Class members are dispersed throughout the United States.   A class action, therefore, is superior to joinder of all Class members.

**There Are Common Questions of Law and Fact for All Proposed Class Members**

181.    As set forth above, the CABOT INVESTMENT sponsored TIC investments, including the TIC investments for the Florida Properties, employed identical structures and common agreements.

182.    There are questions of law and fact common to the Class, including but not limited to the following:

   a.    Whether there was an embezzlement from the Florida Properties;

   b.    Whether the Investor Reports transmitted to Plaintiffs and the Class for the Florida Properties were false and misleading;

   c.    Whether DEFENDANTS owed Plaintiffs and the Class any fiduciary duties;

30

d.      Whether CBRE helped facilitate the embezzlement, helped conceal the embezzlement, and/or failed to alert Plaintiffs and the Class to the embezzlement; and

e.      Whether SILVERMAN and/or ACTUARIAL RISK helped facilitate the embezzlement, helped conceal the embezzlement, and/or failed to alert Plaintiffs and the Class to the embezzlement.

**The Class Representatives Have Claims Typical of the Proposed Class Members**

183.    The Class representatives' claims are typical of the claims of the members of the Class, as set forth below without limitation:

a.      Claims for relief are based on the same legal principles and theories arising from the same events, actions, and omissions of the Defendants affecting all members of the Class;

b.      DEFENDANTS' common course of conduct with respect to Plaintiffs and the Class renders their claims typical;

c.      All members of the proposed Class were injured in the same way by the acts and omissions of the DEFENDANTS;

d.      The relationship between the Class representatives, the Class, and DEFENDANTS are defined by substantively identical agreements and documents;

e.      CABOT and KROLL embezzled funds from all of the Florida Properties;

f.      CBRE managed all of the Florida Properties; and

g.      SILVERMAN and ACTUARIAL RISK prepared, helped prepare, and/or reviewed false and misleading Investor Reports for all of the Florida Properties.

**The Class Representatives Will Fairly and Adequately Represent**
**and Protect the Interests of the Class**

184.    As a representative of the Class, Plaintiffs will fairly and adequately protect the interests of all Class members.

**Class Counsel Will Fairly and Adequately Represent the Interests of the Proposed Class**

185.    Plaintiffs are represented by attorneys who are competent and experienced in the prosecution of class action litigation and are otherwise experienced commercial litigators.

**Common Questions of Law and Fact Predominate Over Any Potential Individual Issues**

186.    The common questions of law and fact in the proposed Class are subject to generalized proof and applicable to the Class as a whole, as set forth below without limitation:

a.    The proposed Class consists of investors who invested in a common deal structure governed by substantively identical agreements and documents, therefore creating common issues of law and fact for all Class members, such as Defendants' duties towards the Class;

b.    Several issues pertaining to liability and damages are subject to generalized proof, such as whether there was an embezzlement, the amount embezzled from each of the Florida Properties, whether the DEFENDANTS informed Plaintiffs and the Class of the embezzlement, and the amount of investment principal lost by the Class;

c.    All claims and defenses are governed by one body of law, Florida law; and

d.    Any defenses asserted by DEFENDANTS will apply to the Class as a whole.

**A Class Action Is Superior to Other Available Methods for Fairly and Efficiently Adjudicating the Controversy**

187.    Due to the number of proposed Class members and the number of defendants, joinder of all proposed Class members is unreasonable.  And, filing nearly 200 separate lawsuits regarding identical factual circumstances and legal issues would unreasonably burden the Court and the Defendants.

188.    Given the nature of the issues involved in this Complaint and a finding that the other requirements for class certification having been met, a class action lawsuit is the fairest and most efficient manner to adjudicate this controversy.

189.    All conditions precedent to the filing of this action have been satisfied, waived or excused.

**COUNT I - Conversion**
**(against CABOT, KROLL, CABOT INVESTMENT,**
**and the FLORIDA MASTER LESSEES)**

190.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

191.    This is a claim for conversion.

192.    From 2008 to 2012, CABOT and KROLL wrongfully converted to their own use at least $7.9 million that was then Plaintiffs and the Class' property.

193.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were obligated to keep intact and deliver the $7.9 million in converted funds they stole according to the priorities set forth in the Cash Management Agreement, Lock Box Agreement, and Property Management Agreements.

194.    The $7.9 million in converted funds consists of specific money capable of identification pursuant to a priority of disbursements set forth in the Cash Management Agreements and Lock Box Agreements.

195.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES had no right to convert the $7.9 million to their own use.

196.    Plaintiffs and the Class have been permanently deprived of the $7.9 million in converted funds.

197.    At all relevant times, CABOT and KROLL were agents of and officers of CABOT INVESTMENT and the FLORIDA MASTER LESSEES, and by committing the acts described in this Complaint and by failing to act when required to do so, CABOT and KROLL were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

198.    CABOT and KROLL's tortious conduct from 2008 through 2012, as described in this Complaint, was committed within the scope of their employment by CABOT INVESTMENT and the FLORIDA MASTER LESSEES and in furtherance of CABOT INVESTMENT and the FLORIDA MASTER LESSEES' interests.

199.    CABOT INVESTMENT and the FLORIDA MASTER LESSEES are therefore also liable to Plaintiffs and the Class for CABOT and KROLL's acts and omissions as alleged in this Complaint.

**WHEREFORE**, Plaintiffs and the Class request judgment against CARLTON P. CABOT, TIMOTHY J. KROLL, CABOT INVESTMENT PROPERTIES, LLC, CABOT EAST BROWARD LEASECO, LLC, CABOT NORTH ORANGE LEASECO, LLC, CABOT OAK GROVE ASSET MANAGER, LLC, CABOT TRAFALGAR/AVION LEASECO, LLC, CABOT CYPRESS CREEK LEASECO, LLC, and CABOT NORTH UNIVERSITY LEASECO, LLC for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

**COUNT II – Breach of Fiduciary Duty**
**(against CABOT, KROLL, CABOT INVESTMENT,**
**and the FLORIDA MASTER LESSEES)**

200.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

201.    This is a claim for breach of fiduciary duties of honesty, loyalty, and care.

202.    Plaintiffs and the Class reposed absolute trust and confidence in CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES to advise, counsel, and protect Plaintiffs and the Class and their properties.  The TIC investment structure and IRS rules made Plaintiffs and the Class weaker parties with unique vulnerabilities, including, *inter alia*, that Plaintiffs and the Class were prohibited from actively manage their investments.

203.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES accepted that trust and confidence.

204.    Plaintiffs and the Class depended on CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES to manage the Florida Properties according to the requirements in the Loan Documents and the Property Management Agreements.

205.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were also Plaintiffs and the Class' agents.

206.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES also had access to superior and exclusive knowledge about the Florida Properties that Plaintiffs and the Class did not have, such as information about the financial performance of the Florida Properties and the flow of funds to and from the Florida Properties.

207.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES owed Plaintiffs and the Class fiduciary duties of honesty, loyalty, and care.  CABOT,

34

KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES further had a duty to use their special skills for Plaintiffs and the Class' benefit.

208. CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES breached their fiduciary duties to Plaintiffs and the Class by embezzling funds from the Florida Properties, concealing the embezzlement, and/or failing to alert Plaintiffs and the Class to the embezzlement.

209. CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs and the Class.

210. At all relevant times, CABOT and KROLL were agents of and officers of CABOT INVESTMENT and the FLORIDA MASTER LESSEES, and by committing the acts described in this Complaint and by failing to act when required to do so, CABOT and KROLL were acting in the course and within the scope of their authority as agents and officers, and in the transaction of the business of the employment or agency.

211. CABOT and KROLL's tortious conduct from 2008 through 2012, as described in this Complaint, was committed within the scope of their employment by CABOT INVESTMENT and the FLORIDA MASTER LESSEES and in furtherance of CABOT INVESTMENT and the FLORIDA MASTER LESSEES' interests.

212. CABOT INVESTMENT and the FLORIDA MASTER LESSEES are therefore also liable to Plaintiffs and the Class for CABOT and KROLL's acts and omissions as alleged in this Complaint.

**WHEREFORE**, Plaintiffs and the Class request judgment against CARLTON P. CABOT, TIMOTHY J. KROLL, CABOT INVESTMENT PROPERTIES, LLC, CABOT EAST BROWARD LEASECO, LLC, CABOT NORTH ORANGE LEASECO, LLC, CABOT OAK GROVE ASSET MANAGER, LLC, CABOT TRAFALGAR/AVION LEASECO, LLC, CABOT CYPRESS CREEK LEASECO, LLC, and CABOT NORTH UNIVERSITY LEASECO, LLC for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT III – Constructive Fraud
### (against CABOT, KROLL, CABOT INVESTMENT,
### and the FLORIDA MASTER LESSEES)

213.     Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

214.     This is a claim for constructive fraud which equity regards as wrongful.

215.     Plaintiffs and the Class had a confidential relationship with CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES.

216.     CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES owed fiduciary duties of honesty, care, and loyalty to Plaintiffs and the Class.

217.     CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES knew that the structure of Plaintiffs and the Class' TIC investments made them vulnerable because active management of the TIC investment would eliminate the tax benefits of the investment.

218.     CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES abused the confidential and fiduciary relationships and constructively defrauded Plaintiffs and the Class by embezzling funds from the Florida Properties, helping to conceal the embezzlement, misrepresenting to Plaintiffs and the Class the true use of funds in their TIC investment, and/or failing to alert Plaintiffs and the Class to the embezzlement.

219.     CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against CARLTON P. CABOT, TIMOTHY J. KROLL, CABOT INVESTMENT PROPERTIES, LLC, CABOT EAST BROWARD LEASECO, LLC, CABOT NORTH ORANGE LEASECO, LLC, CABOT OAK GROVE ASSET MANAGER, LLC, CABOT TRAFALGAR/AVION LEASECO, LLC, CABOT CYPRESS CREEK LEASECO, LLC, and CABOT NORTH UNIVERSITY LEASECO, LLC for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT IV – Breach of Fiduciary Duty
### (against CBRE)

220.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

221.    This is a claim for breach of fiduciary duties of honesty, loyalty, and care.

222.    Plaintiffs and the Class reposed trust and confidence in CBRE to advise, counsel, and protect Plaintiffs and the Class.  The TIC investment structure and IRS rules made Plaintiffs and the Class weaker parties with unique vulnerabilities including, *inter alia*, that Plaintiffs and the Class could not actively manage their investments.

223.    Plaintiffs and the Class depended on CBRE to manage the Florida Properties according to the requirements in the Loan Documents.

224.    CBRE accepted Plaintiffs' and the Class' trust and confidence.

225.    CBRE also had access to superior and exclusive knowledge about the Florida Properties that Plaintiffs and the Class did not have, such as information about the financial performance of the Florida Properties and the flow of funds to and from the Florida Properties.

226.    CBRE was also sub-agent to Plaintiffs' and the Class' agents, CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES.

227.    CBRE owed Plaintiffs and the Class fiduciary duties of honesty, loyalty, and care. CBRE further had a duty to use its special skills to Plaintiffs and the Class' benefit.

228.    CBRE breached its fiduciary duties to Plaintiffs and the Class by failing to alert Plaintiffs and the Class to the embezzlement and helping to perpetuate and conceal the embezzlement from Plaintiffs and the Class.

229.    CBRE's breach of its fiduciary duties directly and proximately caused injury and damages to Plaintiffs and the Class.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT V – Constructive Fraud
### (against CBRE)

230.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

231.    This is a claim for constructive fraud which equity regards as wrongful.

232.    Plaintiffs and the Class had a confidential relationship with CBRE.

233.    CBRE owed fiduciary duties of honesty, care, and loyalty to Plaintiffs and the Class.

234.    CBRE's relationship with Plaintiffs and the Class was predicated on confidence and trust.

235.    CBRE knew that the structure of Plaintiffs and the Class' TIC investments made them vulnerable because active management of the TIC investment would eliminate the tax benefits of the investment.

236.    CBRE abused the confidential and fiduciary relationships and constructively defrauded Plaintiffs and the Class by failing to alert Plaintiffs and the Class to the embezzlement and helping to facilitate and conceal the embezzlement from Plaintiffs and the Class.

237.    CBRE's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT VI – Aiding and Abetting Conversion
### (against CBRE)

238.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint

239.    This is a claim for aiding and abetting conversion.

240.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES unlawfully converted $7.9 million of Plaintiffs and the Class' property to their own use.

241.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were obligated to keep intact and deliver the $7.9 million in converted funds they stole from Plaintiffs and the Class.

242.    CBRE knew that CABOT and KROLL were unlawfully converting Plaintiffs and the Class' property to their own use.

243.    CBRE rendered substantial assistance to CABOT and KROLL successful conversion of Plaintiffs and the Class' property.

244.    Plaintiffs and the Class have been permanently deprived of the $7.9 million in converted funds.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT VII – Aiding and Abetting Breach of Fiduciary Duties
## (against CBRE)

245.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint

246.    This is a claim for aiding and abetting breach of fiduciary duties.

247.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES owed Plaintiffs and the Class fiduciary duties of honesty, loyalty, and care.

248.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES breached their fiduciary duties.

249.    CBRE knew that CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were breaching their fiduciary duties towards Plaintiffs and the Class.

250.    CBRE rendered substantial assistance to CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties owed to Plaintiffs and the Class.

251.    CBRE's aiding and abetting CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs and the Class.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT VIII – Aiding and Abetting Constructive Fraud
## (against CBRE)

252.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

253.    This is a claim for aiding and abetting constructive fraud.

254.    CABOT and KROLL abused the confidential and fiduciary relationships with Plaintiffs and the Class and constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

255.    CBRE knew that CABOT and KROLL constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

256.    CBRE rendered substantial assistance to CABOT and KROLL's constructive fraud against Plaintiffs and the Class.

257.    CBRE's aiding and abetting CABOT and KROLL's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT IX – Negligent Supervision of an Employee
### (against CBRE)

258.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

259.    This is a claim for negligent supervision of an employee.

260.    As described more fully above, HERNANDEZ participated, with actual or constructive knowledge, in CABOT and KROLL's embezzlement from the Florida Properties. HERNANDEZ's participation included, but was not limited to, assisting in and/or preparing false financial statements regarding the Florida Properties provided to CABOT INVESTMENT and/or the FLORIDA MASTER LESSEES, providing TIC investors with false and misleading information about the Florida Properties, and concealing the ongoing embezzlement.

261.    CBRE owed a duty of reasonable care to Plaintiffs and the Class to ensure that its employees were not actively defrauding the Florida Properties' owners by facilitating and/or concealing the ongoing embezzlement at the Florida Properties.

262.    CBRE breached its duties to Plaintiffs and the Class because it had actual or constructive notice that HERNANDEZ, a senior real estate manager for CBRE, was either actively participating in CABOT and KROLL's embezzlement, failed to alert Plaintiffs and the

Class of the embezzlement, or negligently participated in the embezzlement.  CBRE acted unreasonably in failing to investigate or take corrective action.

263.    As a direct and proximate result of CBRE's failure to investigate or take corrective action against HERNANDEZ, Plaintiffs and the Class sustained damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against CBRE, INC. for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT X – Constructive Fraud
### (against HERNANDEZ)

264.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

265.    This is a claim for constructive fraud which equity regards as wrongful.

266.    HERNANDEZ, as CBRE's agent and employee, owed fiduciary duties of honesty, care, and loyalty to Plaintiffs and the Class.

267.    HERNANDEZ's relationship with Plaintiffs and the Class was a confidential relationship predicated on confidence and trust.

268.    HERNANDEZ knew that the structure of Plaintiffs and the Class' TIC investments made them vulnerable because active management of the TIC investment would eliminate the tax benefits of the investment.

269.    HERNANDEZ abused the confidential and fiduciary relationships with Plaintiffs and the Class and constructively defrauded Plaintiffs and the Class by failing to alert Plaintiffs and the Class to the embezzlement and helping to facilitate and conceal the embezzlement from Plaintiffs and the Class.

270.    HERNANDEZ's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against GLORIA HERNANDEZ for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT XI – Aiding and Abetting Conversion
### (against HERNANDEZ)

271.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

272.    This is a claim for aiding and abetting conversion.

273.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES unlawfully converted $7.9 million of Plaintiffs and the Class' property to their own use.

274.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were obligated to keep intact and deliver the $7.9 million in converted funds they stole from Plaintiffs and the Class.

275.    HERNANDEZ knew that CABOT and KROLL were unlawfully converting Plaintiffs and the Class' property to their own use.

276.    HERNANDEZ rendered substantial assistance to CABOT and KROLL successful conversion of Plaintiffs and the Class' property.

277.    Plaintiffs and the Class have been permanently deprived of the $7.9 million in converted funds.

**WHEREFORE**, Plaintiffs and the Class request judgment against GLORIA HERNANDEZ for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT XII – Aiding and Abetting Constructive Fraud
### (against HERNANDEZ)

278.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

279.    This is a claim for aiding and abetting constructive fraud.

280.    CABOT and KROLL constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

281.    CBRE knew that CABOT and KROLL constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

282.    HERNANDEZ rendered substantial assistance to CABOT and KROLL's constructive fraud against Plaintiffs and the Class.

42

283.    HERNANDEZ's aiding and abetting CABOT and KROLL's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

**WHEREFORE**, Plaintiffs and the Class request judgment against GLORIA HERNANDEZ for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT XIII – Aiding and Abetting Breach of Fiduciary Duties
### (against HERNANDEZ)

284.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint

285.    This is a claim for aiding and abetting breach of fiduciary duties.

286.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES owed Plaintiffs and the Class fiduciary duties of honesty, loyalty, and care.

287.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES breached their fiduciary duties.

288.    HERNANDEZ knew that CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were breaching their fiduciary duties towards Plaintiffs and the Class.

289.    HERNANDEZ rendered substantial assistance to CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties owed to Plaintiffs and the Class.

290.    HERNANDEZ's aiding and abetting CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs and the Class.

**WHEREFORE**, Plaintiffs and the Class request judgment against GLORIA HERNANDEZ for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT XIV – Constructive Fraud
### (against SILVERMAN and ACTUARIAL RISK)

291.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

292.    This is a claim for constructive fraud which equity regards as wrongful.

293.    SILVERMAN and ACTUARIAL RISK owed fiduciary duties of honesty, care, and loyalty to Plaintiffs and the Class.

294.    SILVERMAN and ACTUARIAL RISK's relationship with Plaintiffs and the Class was a confidential relationship predicated on confidence and trust.

295.    SILVERMAN and ACTUARIAL RISK knew that the structure of Plaintiffs and the Class' TIC investments made them vulnerable because active management of the TIC investment would eliminate the tax benefits of the investment.

296.    SILVERMAN and ACTUARIAL RISK abused the confidential and fiduciary relationships with Plaintiffs and the Class and constructively defrauded Plaintiffs and the Class by failing to alert Plaintiffs and the Class to the embezzlement and helping to facilitate and conceal the embezzlement from Plaintiffs and the Class.

297.    SILVERMAN and ACTUARIAL RISK's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

298.    From in or about January 2010 through 2012, SILVERMAN was the agent and employee of ACTUARIAL RISK, and by committing the acts described in this Complaint and by failing to act when required to do so, was acting in the course and within the scope of his authority as agent and employee, and in the transaction of the business of the employment or agency.

299.    SILVERMAN's tortious conduct from 2010 through 2012, as described in this Complaint, was committed within the scope of his employment at ACTUARIAL RISK and in furtherance of ACTUARIAL RISK's interests.

300.    ACTUARIAL RISK is therefore also liable to Plaintiffs and the Class for SILVERMAN's acts and omissions as alleged in this Complaint under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiffs and the Class request judgment against HARRY L. SILVERMAN and ACTUARIAL RISK MANAGEMENT, LTD for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT XV – Aiding and Abetting Conversion
### (against SILVERMAN and ACTUARIAL RISK)

301.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

302.    This is a claim for aiding and abetting conversion.

303.    CABOT and KROLL unlawfully converted $7.9 million of Plaintiffs and the Class' property to their own use.

304.    SILVERMAN and ACTUARIAL RISK knew that CABOT and KROLL were unlawfully converting Plaintiffs and the Class' property to their own use.

305.    SILVERMAN and ACTUARIAL RISK rendered substantial assistance to CABOT and KROLL successful conversion of Plaintiffs and the Class' property.

306.    Plaintiffs and the Class have been permanently deprived of the $7.9 million in converted funds.

307.    From in or about January 2010 through 2012, SILVERMAN was the agent and employee of ACTUARIAL RISK, and by committing the acts described in this Complaint and by failing to act when required to do so, was acting in the course and within the scope of his authority as agent and employee, and in the transaction of the business of the employment or agency.

308.    SILVERMAN's tortious conduct from 2010 through 2012, as described in this Complaint, was committed within the scope of his employment at ACTUARIAL RISK and in furtherance of ACTUARIAL RISK's interests.

309.    ACTUARIAL RISK is therefore liable to Plaintiffs and the Class for SILVERMAN's acts and omissions as alleged in this Complaint under the doctrine of *respondeat superior.*

**WHEREFORE**, Plaintiffs and the Class request judgment against HARRY L. SILVERMAN and ACTUARIAL RISK MANAGEMENT, LTD for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## COUNT XVI – Aiding and Abetting Breach of Fiduciary Duty
### (against SILVERMAN and ACTUARIAL RISK)

310.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

311.    This is a claim for aiding and abetting breach of fiduciary duties.

312.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES owed Plaintiffs and the Class fiduciary duties of honesty, loyalty, and care.

313.    CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES breached their fiduciary duties.

314.    SILVERMAN and ACTUARIAL RISK knew that CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES were breaching their fiduciary duties towards Plaintiffs and the Class.

315.    SILVERMAN and ACTUARIAL RISK rendered substantial assistance to CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties owed to Plaintiffs and the Class.

316.    SILVERMAN and ACTUARIAL RISK aiding and abetting CABOT, KROLL, CABOT INVESTMENT, and the FLORIDA MASTER LESSEES' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs and the Class.

317.    From in or about January 2010 through 2012, SILVERMAN was the agent and employee of ACTUARIAL RISK, and by committing the acts described in this Complaint and by failing to act when required to do so, was acting in the course and within the scope of his authority as agent and employee, and in the transaction of the business of the employment or agency.

318.    SILVERMAN's tortious conduct from 2010 through 2012, as described in this Complaint, was committed within the scope of his employment at ACTUARIAL RISK and in furtherance of ACTUARIAL RISK's interests.

319.    ACTUARIAL RISK is therefore liable to Plaintiffs and the Class for SILVERMAN's acts and omissions as alleged in this Complaint under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiffs and the Class request judgment against HARRY L. SILVERMAN and ACTUARIAL RISK MANAGEMENT, LTD for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT XVII – Aiding and Abetting Constructive Fraud
### (against SILVERMAN and ACTUARIAL RISK)

320.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

321.    This is a claim for aiding and abetting constructive fraud which equity regards as wrongful.

322.    CABOT and KROLL constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

323.    SILVERMAN and ACTUARIAL RISK knew that CABOT and KROLL constructively defrauded Plaintiffs and the Class by embezzling $7.9 million from the Florida Properties and concealing the embezzlement.

324.    SILVERMAN and ACTUARIAL RISK rendered substantial assistance to CABOT and KROLL's constructive fraud against Plaintiffs and the Class.

325.    SILVERMAN and ACTUARIAL RISK's aiding and abetting CABOT and KROLL's constructive fraud caused Plaintiffs and the Class to suffer injuries, including monetary damages.

326.    From in or about January 2010 through 2012, SILVERMAN was the agent and employee of ACTUARIAL RISK, and by committing the acts described in this Complaint and by failing to act when required to do so, was acting in the course and within the scope of his authority as agent and employee, and in the transaction of the business of the employment or agency.

327.    SILVERMAN's tortious conduct from 2010 through 2012, as described in this Complaint, was committed within the scope of his employment at ACTUARIAL RISK and in furtherance of ACTUARIAL RISK's interests.

328.    ACTUARIAL RISK is therefore liable to Plaintiffs and the Class for SILVERMAN's acts and omissions as alleged in this Complaint under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiffs and the Class request judgment against HARRY L. SILVERMAN and ACTUARIAL RISK MANAGEMENT, LTD for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

### COUNT XVIII – Civil Conspiracy
### (against all DEFENDANTS)

329.    Plaintiffs and the Class incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 to 189 of this Complaint.

330.    This is a claim for civil conspiracy.

331.    From 2008 through 2012, DEFENDANTS and others known and unknown, knowingly and willfully conspired and agreed among themselves to embezzle millions of dollars

from the Florida Properties, conceal the embezzlement, and/or not inform Plaintiffs and the Class about the embezzlement.

332.    The conspiracy's objectives were to convert Plaintiff and the Class' property; breach fiduciary duties of honesty, loyalty, and care owed to Plaintiffs and the Class; constructively defraud Plaintiffs and the Class; and continue to collect fees for services rendered by the DEFENDANTS.

333.    The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave DEFENDANTS undue economic influence and power over Plaintiffs and the Class, including the power to exclude and coerce Plaintiffs and the Class. DEFENDANTS' concerted action and force of numbers also served to unduly coerce and injure Plaintiffs and the Class.  The conspiracy gave DEFENDANTS powers that an individual acting alone would not possess.  The civil conspiracy thus constitutes an independent, actionable tort.

334.    DEFENDANTS acted wantonly and maliciously towards Plaintiffs by conspiring to steal from Plaintiffs and the Class, conspiring to conceal the theft, and/or conspiring to keep silent about the embezzlement so as to keep Plaintiffs and the Class from learning about the embezzlement.

335.    The following overt acts, among others, were taken in furtherance of the conspiracy:

a.      CABOT and KROLL embezzled at least $7.9 million from the Florida Properties from 2008 through 2012, including $10,000 embezzled from East Broward on July 2, 2012 and $6,000 embezzled from East Broward on July 16, 2012;

b.      HERNANDEZ, while employed by CBRE, sent CABOT INVESTMENT and the FLORIDA MASTER LESSEES false and misleading financial reports about the Florida Properties;

c.      KROLL sent false and misleading Investor Reports to Plaintiffs and the Class, including false and misleading Investor Reports regarding East Broward on July 1, 2011; and

d.      SILVERMAN helped KROLL prepared false and misleading Investor Reports.

336.    Defendants' conduct, as perpetrated through the conspiracy, directly caused injury and damage to Plaintiffs and the Class.

**WHEREFORE**, Plaintiffs and the Class request judgment against CARLTON P. CABOT, TIMOTHY J. KROLL, CABOT INVESTMENT PROPERTIES, LLC, CABOT EAST BROWARD LEASECO, LLC, CABOT NORTH ORANGE LEASECO, LLC, CABOT OAK GROVE ASSET MANAGER, LLC, CABOT TRAFALGAR/AVION LEASECO, LLC, CABOT CYPRESS CREEK LEASECO, LLC, CABOT NORTH UNIVERSITY LEASECO, LLC, CBRE, INC., GLORIA HERNANDEZ, ACTUARIAL RISK MANAGEMENT, LTD., and HARRY L. SILVERMAN for compensatory damages, together with interest, court costs, and such further relief as the Court deems proper.

## PETITION FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand that the Court grant relief as follows:

A.    Certify this action as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, determine that Plaintiffs are proper class representatives, that Plaintiffs' attorneys be appointed class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that class notice be promptly issued;

B.    Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial against Defendants, jointly and severally;

C.    Awarding Plaintiffs and the Class pre-judgment interest;

D.    Granting Plaintiffs and the Class such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and others similarly situated, pursuant to Federal Rule of Civil Procedure 38, hereby demand a jury trial on any and all claims so triable.


Dated:  June 7, 2016                                 Respectfully submitted,

                                                     STEARNS WEAVER MILLER WEISSLER
                                                     ALHADEFF & SITTERSON, P.A.
                                                     Counsel for Plaintiffs and the Class
                                                     150 West Flagler Street, Suite 2200
                                                     Miami, FL 33130
                                                     Telephone:  305.789.3200
                                                     Facsimile:  305.789.3395


                                                     s/ Mark P. Dikeman
                                                     Mark P. Dikeman
                                                     Florida Bar No. 623547
                                                     mdikeman@stearnsweaver.com
                                                     Jason P. Hernandez
                                                     Florida Bar No. 18598
                                                     jhernandez@stearnsweaver.com
                                                     Mary Barzee Flores
                                                     Florida Bar No. 0797235
                                                     mbarzeeflores@stearnsweaver.com
                                                     Ryan T. Thornton
                                                     Florida Bar No. 99195
                                                     rthornton@ stearnsweaver.com

#5007823 v1