# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-61218-CIV-DIMITROULEAS/SNOW

Cabot East Broward 2 LLC
and Cabot East Broward 34 LLC, individually
and on behalf of all others similarly situated,

        Plaintiffs,

v.                            CLASS ACTION

Carlton P. Cabot, et. al.,

        Defendants.

_____/

### CBRE, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JEREMY S. LARKIN, INCORPORATED MEMORANDUM OF LAW

Hardy L. Roberts, III (0062545)
Email: hroberts@careyomalley.com
CAREY O'MALLEY WHITAKER
MUELLER ROBERTS & SMITH
712 S. Oregon Avenue
Tampa, Florida 33606
Tel:   (813) 250-0577

Thomas Meeks (314323)
Email: tmeeks@carltonfields.com
Yolanda P. Strader (70212)
Email: ystrader@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
100 SE Second Street, Suite 4200
Miami, Florida 33131
Tel:     (305) 530-0050
Fax:    (305) 530-0055

Sylvia H. Walbolt (33604)
Email: swalbolt@carltonfields.com
D. Matthew Allen (866326)
Email: mallen@carltonfields.com
Mariko Shitama Outman (106681)
Email: msoutman@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
Corporate Center Three at International Plaza
4221 w. Boy Scout Blvd. – Suite 1000
Tampa, Florida 33607-5780

*Co-Counsel for Defendant CBRE, Inc*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

MOTION TO EXCLUDE................................................................................................. 1

MEMORANDUM OF LAW ............................................................................................. 2

   I.   Larkin's Opinions On Questions Of Law Are Inadmissible   As Invading The Court's Province. ........................................................................................................ 2

   II.   Larkin's Opinions Are Unreliable. ..................................................................... 4

      A.   Larkin's General Experience Provides No Basis For Reliable Opinions As  To The Particular Investment At Issue In This Case............................................ 4

      B.   Larkin's Litigation-Driven Opinions On The Issue Of Duty Lack Intellectual Rigor, Including Any Reference To Any Objective Source, Standard, Or Other Indicia Of Reliability. ................................................................................. 6

         1.   Larkin ignores critical provisions of the contract documents on which he opines. ....................................................................................................... 6

         2.   Larkin points to no objective standard or authority to support his opinion that a fiduciary duty existed here............................................................... 8

         3.   Larkin relies on unreliable evidence of conversations with unidentified tax experts. ................................................................................................. 10

   III.   Larkin's Opinion That CBRE "Knew" Of The Misappropriation  Is An Inadmissible "State Of Mind" Opinion.................................................................. 13

   IV.   Larkin's Further Opinions That CBRE "Should Have Known" It Owed A Fiduciary Duty To The Investors And "Should Have Known" LeaseCo Was "Misappropriating" The Operating Monies Are Irrelevant To The issues In This Case.............................................................................................................. 14

   V.   Larkin's Testimony Is Impermissible Closing Argument For Plaintiffs Clothed With The Imprimatur Of An "Expert."............................................................... 14

CONCLUSION................................................................................................................ 16

CERTIFICATE OF GOOD FAITH CONFERENCE ................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allison v. McGhan Med. Corp.*,
 184 F.3d 1300 (11th Cir. 1999) ........................................................................14

*Bethea v. Bristol Lodge Corp.*,
 2002 WL 31859434 (E.D. Pa. Dec. 18, 2002) ....................................................10

*Birge v. Dollar Gen. Corp.*,
 2006 WL 5175758 (W.D. Tenn. Sep. 28, 2006)....................................................9

*Brown Jordan Int'l Inc v. Carmicle*,
 2015 WL 11661770 (S.D. Fla. Oct. 9, 2015)........................................................2

*Burger King Corp. v. Austin*,
 805 F. Supp. 1007 (S.D. Fla. 1992) .....................................................................8

*BVS Acquisition Co. v. Brown*,
 649 F. App'x 651 (11th Cir. 2016) ................................................................8, 15

*City of Tuscaloosa v. Harcros Chems., Inc.*,
 158 F.3d 548 (11th Cir. 1998) ...........................................................................15

*Cook v. Sheriff of Monroe Cty., Fla.*,
 402 F.3d 1092 (11th Cir. 2005) ...........................................................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)...................................................................... *passim*

*In re Diet Drugs*,
 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ..........................................................10

*Floorographics v. News American Mktg. In-Store Servs., Inc.*,
 546 F. Supp. 2d 155 (D. N.J. 2008) ....................................................................11

*Goldweber v. Harmony Partners, Ltd.*,
 2010 WL 3702508 (S.D. Fla. Sept. 16, 2010) ......................................................7

*Grdinich v. Bradlees*,
 187 F.R.D. 77 (S.D.N.Y. 1999) ...........................................................................9

*Halcomb v. Wash. Metro. Area Transit Auth.*,
 526 F. Supp. 2d 24 (D.D.C. 2007) .....................................................................13

*Hansen v. Wheaton Van Lines, Inc.*,
    468 F. Supp. 2d 1339, 1346 (S.D. Fla. 2006) ...................................................15

*Harris Corp. v. Giesting & Assocs., Inc.*,
    297 F.3d 1270 (11th Cir. 2002) ...........................................................................7

*Hayes v. MTD Prods., Inc.*,
    518 F. Supp. 2d 898 (W.D. Ky. 2007).................................................................14

*Hermitage Indus. v. Schwerman Trucking Co.*,
    814 F. Supp. 484 (D.S.C. 1993)............................................................................3

*Hirsch v. Jupiter Golf Club LLC*,
    232 F. Supp. 3d 1243 (S.D. Fla. 2017) .................................................................7

*Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*,
    512 F. Supp. 2d 1178 (D. Kan. 2007) .................................................................11

*Jackson v. Nat'l Action Fin. Servs.*,
    441 F. Supp. 2d 877 (N.D. Ill. 2006) ..................................................................11

*Johnson v. Bush*,
    2002 WL 34355953 (S.D. Fla. Apr. 19, 2002) .....................................................3

*Kaufman v. Pfizer Pharm., Inc.*,
    2011 WL 7659333 (S.D. Fla. Aug. 4, 2011).........................................................9

*Kilpatric v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) ...........................................................................6

*Klaczak v. Consol. Med. Transp., Inc.*,
    2005 WL 1564981 (N.D. Ill. May 26, 2005) ........................................................3

*Lasorsa v. Showboat: The Mardi Gras Casino*,
    2009 WL 2929234 (D. N.J. Sept. 9, 2009) .........................................................10

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ..................................................................12

*Mac-Gray Servs., Inc. v. DeGeorge*,
    913 So. 2d 630 (Fla. 4th DCA 2005) ....................................................................8

*Malletier v. Dooney & Burke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)..................................................................11

*Mamani v. Berzain*,
    2018 WL 1010582 (S.D. Fla. Feb. 22, 2018 (same)...........................................6

*MAR Oil Co. v. Korpan*,
   973 F. Supp. 2d 775 (N.D. Ohio 2013)....................................................................13

*McCain v. Fla. Power Corp.*,
   593 So. 2d 500 (Fla. 1992)...........................................................................................2

*Montgomery v. Aetna Cas. & Sur. Co.*,
   898 F.2d 1537 (11th Cir. 1990) ...............................................................................2, 3

*Omar v. Babcock*,
   177 F. App'x 59 (11th Cir. 2006) ..............................................................................13

*In re Pempro Prod. Liab. Litig.*,
   554 F. Supp. 2d 871 (E.D. Ark. 2008), *rev'd in part on other grounds*, 586
   F.3d 547 (8th Cir. 2009) ............................................................................................15

*In re Pempro Prods. Liab. Litig.*,
   2010 WL 5576305 (E.D. Ark. June 29, 2010)...........................................................10

*Recreational Dev. of Phoenix, Inc. v. City of Phoenix*,
   220 F. Supp. 2d 1054 (D. Ariz. 2002) .......................................................................11

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................15

*S.E.C. v. Handgis*,
   1995 WL 133769 (S.D.N.Y. Mar. 28, 1995) .............................................................13

*In re Seroquel Prods. Liab. Litig.*,
   2009 WL 3806436 (M.D. Fla. July 20, 2009) ...........................................................13

*United States v. City of Miami, Fla.*,
   115 F.3d 870 (11th Cir. 1997) .................................................................................7, 9

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) (en banc) ................................................4, 6, 15, 16

*Wiand v. Wells Fargo Bank, N.A.*,
   2014 WL 1819616 (M.D. Fla. May 7, 2014).............................................................13

*Woodhull v. Cty. of Kent*,
   2006 WL 2228986 (W.D. Mich. Aug. 3, 2006)..........................................................13

**Other Authorities**

Federal Rule of Evidence Rule 402 ....................................................................................1

Federal Rule of Evidence Rule 403 ..................................................................................16

Federal Rule of Evidence Rule 702 ..................................................................................6, 14, 16

Federal Rule of Evidence Rule 703 .............................................................................................11

Federal Rule of Evidence Rule 704 ...............................................................................................2

Revenue Procedure 2002-22 ..........................................................................................................5

S.D. Fla. Local Rule 7.1...............................................................................................................17

**MOTION TO EXCLUDE**

Plaintiffs' expert Jeremy Larkin proposes to opine on alleged fiduciary and contractual duties of CBRE to the TIC investors (and CBRE's alleged breach) under a very specific type of tax investment structure entered into pursuant to very specific contractual terms and conditions. While some of Larkin's opinions are couched in terms of commercial real estate "management" failures, all of them are inextricably tied to, and intertwined with, his opinions regarding CBRE's purported legal duties to the TIC investors. At bottom, they constitute improper expert testimony on pure issues of law, legal conclusions, or unreliable, unsupported opinion on matters not appropriate for expert testimony.

The existence of a legal duty is a question of law for the Court, not a subject for expert testimony. Moreover, nothing in Larkin's general experience establishes that he has a reliable basis to opine on the specific tax and legal issues upon which his opinions rest. He points to no authoritative source that supports his opinions with respect to this particular type of investment, and admits there are no governing industry standards.

Larkin also fails to take into account directly relevant facts and governing contractual terms, including terms that expressly contradict assumptions upon which his implied fiduciary duty opinions rest. He offers only his own subjective opinion, supported by nothing but his own *ipse dixit*, telling the jury what result to reach on the ultimate issues in the case.

As shown in the following memorandum, Larkin's opinions cannot withstand scrutiny under the rigorous analysis this Court performs as the "gatekeeper" for expert testimony. Nor will they assist the trier of fact. While there might have been some limited matters touched by Larkin's proffered testimony on which he might offer appropriate expert opinions, the inadmissible aspects are pervasive and inseparable.

As a result, his testimony should be excluded under Federal Rules of Evidence 402 and 702 and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] The burden is on the proponent of expert testimony to demonstrate its admissibility by a preponderance of the evidence. Plaintiffs cannot meet that burden with respect to Larkin's testimony.

---

[1] In an abundance of caution, CBRE has identified Lori Bluett as a rebuttal expert on real estate matters to counter Larkin's proposed testimony, and Bluett thus necessarily addresses many of the matters on which Larkin seeks to testify. If Larkin is excluded, Bluett will not testify.

<u>**MEMORANDUM OF LAW**</u>

**I.      <u>Larkin's Opinions On Questions Of Law Are Inadmissible</u>**
          **<u>As Invading The Court's Province.</u>**

Larkin opines as a threshold matter for all of his other opinions that CBRE owed the TIC investors a fiduciary duty to manage the leased properties in their best interests and, in particular, to advise them of the "misappropriation" of operation monies by LeaseCo.  *See generally* February 21, 2018 "Expert Report of Jeremy S. Larkin" ("Report") (**attached hereto** as **Exhibit A**).  His opinions essentially track the arguments previously advanced by Plaintiffs to this Court on the legal issue of duty.  Plaintiffs now seek to have Larkin convey those same legal arguments to the jury under the imprimatur of expert testimony.

The existence of a legal duty, however, is a question for the Court.  *McCain v. Fla. Power Corporation,* 593 So. 2d 500, 502 (Fla. 1992).  Experts may not instruct the jury on issues of law, including the issue of duty.  *See e.g., Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990) (expert testimony constituted concerning scope of insurer's duty under policy stricken as improper); *Brown Jordan Int'l Inc v. Carmicle*, 2015 WL 11661770, at *1 (S.D. Fla. Oct. 9, 2015) (expert's opinions that defendant owed and breached a fiduciary duty were inadmissible legal opinions).

There are, of course, cases in which there is an issue of fact for the jury whether, with direct promises of trust to particular plaintiffs, the defendant accepted a position of trust.  But that is not the case here.  Indeed, Plaintiffs say this is a common issue that can be resolved on a classwide basis, without considering individual facts.  (*See, e.g.*, ECF 184 at 22-23; ECF 198 at 12-15).

Larkin's conclusions regarding the existence of a fiduciary duty to the TIC investors, and the specific legal obligations arising as a result of such a duty, directly rest on pure matters of law and directly opine on the ultimate duty issues presented by Plaintiffs' claims.  Indeed, his opinions are couched in decidedly legal terms.  To be sure, under Rule 704, an otherwise admissible expert opinion is not excludable simply because it touches on an ultimate issue that the jury will have to decide.  But courts scrutinize such opinions as a threshold matter to ensure the expert is not simply telling the jury what result to reach on an ultimate issue.  *See Montgomery*, 898 F. 2d at 1541.  That is exactly what Larkin impermissibly seeks to do.

Similarly, courts guard against experts offering opinions on the legal implications of party's conduct.  *Id.* ("[T]he court must be the jury's only source of law."); *Johnson v. Bush*, 2002 WL 34355953, at *1 n.1 (S.D. Fla. Apr. 19, 2002) ("Each courtroom comes equipped with a 'legal expert,' called a judge.") (citation omitted).

And, expert testimony invades the court's role when the expert offers opinions on ultimate issues couched in terms that have a definite legal meaning, since the witness is thereby effectively instructing the jury on legal issues.  *See Klaczak v. Consol. Med. Transp., Inc.*, 2005 WL 1564981, at *3-5 (N.D. Ill. May 26, 2005) (expert would not be permitted to opine that defendants committed "fraud"); *Hermitage Indus. v. Schwerman Trucking Co.*, 814 F. Supp. 484, 487 (D.S.C. 1993) (expert testimony that defendant was "negligent" was impermissible legal conclusion because that term has specialized meaning in law).

Larkin's opinions run afoul of these principles.  His report is replete with conclusions and opinions about CBRE's fiduciary and contractual duties to the TIC investors:

- CBRE owed the TIC investors "fiduciary duties," based on certain terms of certain documents, the tax structure of the investment, and industry practice, as well as his view that "by its nature" a property manager owes a fiduciary duty to those investors.  (Report at 11-14)

- Those fiduciary duties impose obligations of "honesty, loyalty, and care."  (Report at 4).

- "By acknowledging that the TIC investors are the property owners and accepting the responsibility to manage in accordance with the Loan Documents, CBRE agreed to monitor the Florida Properties' finances to ensure compliance with the waterfall." (Report at 15; *see also id.* at 4).

- CBRE "accepted responsibility to ensure rents generated" by the properties "were applied in accordance with certain cash management agreements."  (Report at 4).

- Because of the "Master Lease Model" and CBRE's duties Larkin asserts CBRE had under the PMA, CBRE had "unique and superior knowledge about the Florida Properties' finances" and "knew" that "rents were being misappropriated" by LeaseCo.  (Report at 4, 5, 14-15).

- CBRE breached its fiduciary duties by failing to notify investors as to the "misappropriation" of funds.  (Report at 4).

- CBRE breached its fiduciary duties to the investors by billing for its services even though it was "aware" "funds were being misappropriated" by LeaseCo.  (Report at 5).
- CBRE breached its fiduciary duties by "allowing" the properties to incur liens and failing to timely pay vendors and leasing brokers, all as a result of allowing LeaseCo's misappropriation.  (Report at 5).
- CBRE "abdicated . . . responsibility" under the PMA and loan documents "by allowing LeaseCo to control how and when operating expenses were paid."  (Report at 14).

These opinions—couched expressly in legal terms or in code for legal terms (e.g., "abdicated responsibility" for "breached its contract")—should be excluded as invading both the province of the Court on questions of law and the jury on questions of ultimate fact.  They also should be excluded for each of the independent reasons set forth in the following sections.

II.     **Larkin's Opinions Are Unreliable.**

   A.     **Larkin's General Experience Provides No Basis For Reliable Opinions As To The Particular Investment At Issue In This Case.**

Where, as here, an expert witness relies solely on his own experience, "the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Frazier,* 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc).  Larkin does none of this.

The extent of Larkin's experience that purportedly allows him to reliably opine on CBRE's purported fiduciary duty to the TIC investors in this particular section 1031 investment is stated in his report, in its entirety, as follows:

> I have completed 1031 Exchanges for a portion of my personal investments and regularly work with clients in advising, consulting, and executing 1031 Exchanges for clients' property sales.  I am currently working with two clients considering 1031 Exchanges relating to asset sales totaling approximately $10,000,000.

(Report at 1).

This general experience does not remotely satisfy the stringent requirements of *Frazier*: Larkin does not elaborate at all as to who he advised, how he specifically advised them, or whether those transactions had issues similar to the issues on which he opines in this case, such

4

as the duties of the property manager.  Nor does he provide any information confirming his advice was correct.

Nor does Larkin do so in his deposition testimony.  Just the opposite.

There, Larkin admits he is not a tax expert and *has never given another opinion on these 1031 issues*.  Deposition of Jeremy Larkin ("Depo") at 15 (**attached hereto** as **Exhibit B**).  He further admits he is not an expert on Revenue Procedure 2002-22.  *Id.*  Yet, Revenue Procedure 2002-22 is the IRS regulation that he assumes precludes the TIC investors from actively managing the property and, in his opinion, accordingly creates a fiduciary duty of CBRE by virtue of the purported "unique[] dependen[cy]" of the TIC investors on CBRE under that regulation.

Moreover, although Larkin asserts he has general knowledge about 1031 investments, he did not identify a single specific instance in which he has consulted and advised on:

- A 1031 investment pursuant to terms and conditions like those set forth in the PPM agreed to by the investors here;

- the existence of fiduciary duties by a property manager to a 1031 investor under a Master Lease structure in which the investors are not parties to the property management agreement;

- the duties of a property manager to investors under loan documents with terms such as those in the different agreements at issue in this case; or

- a possible breach of duty by a property manager under contracts such as in this case.

In short, nothing in Larkin's general experience in commercial real estate establishes that he can offer reliable opinions on the specific section 1031 issues he seeks to opine on here. Indeed, in his own words, when clients ask him for interpretation of 1031, "I give them the operational structure as I understand it and then encourage them to or *actually direct them to their attorneys and their accountants to understand the actual mechanism of the IRS code*." (Depo. at 15) (emphasis added).

As such, his opinions on the existence of a fiduciary duty of CBRE to the TIC investors (and CBRE's purported breach of that fiduciary duty) are not reliably founded on any specific, real world experience informing his opinions.  Rather than identify any such experience and explain how it enables him to offer his opinions herein, he offers only his own *ipse dixit*, supported by a cursory reference to his experience in making personal section 1031 investments

5

and consulting with clients in very general terms about them, before referring the clients to experts on the issues.

An opinion may not be admitted in evidence based on nothing more than the expert's *ipse dixit*. *Cook v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 US 136, 147 (1997)).  As the Eleventh Circuit cogently put it, "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

Here, Larkin's opinions on the existence of fiduciary and contractual duties of CBRE to the TIC investors do not meet the reliability requirements of Rule 702 and *Daubert*.  Because he cannot reliably opine on the existence of the posited legal duties, he likewise cannot opine on the purported breach of them.  All of his opinions regarding CBRE's purported failures as property manager necessarily rest on his views of CBRE's legal duties and should be excluded.

### B.  Larkin's Litigation-Driven Opinions On The Issue Of Duty Lack Intellectual Rigor, Including Any Reference To Any Objective Source, Standard, Or Other Indicia Of Reliability.

A testifying expert must "rigorously" apply his experience in developing his opinion, in the same way he would in the real world.  He must employ in the courtroom the same level of intellectual rigor that characterizes the real world practices of the expert in the relevant field. *Kilpatric v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also Mamani v. Berzain*, 2018 WL 1010582, at * 4 (S.D. Fla. Feb. 22, 2018 (same).

Larkin failed, in multiple ways, to do that here.

### 1.  Larkin ignores critical provisions of the contract documents on which he opines.

To begin with, Larkin admittedly disregarded the PPM's stated condition of "**NO FIDUCIARY DUTY**," by "dismiss[ing]" the PPM as just a "marketing piece."  (Depo. at 153-54, 162-67).  He admittedly did not consider the investors' Acknowledgment and Agreement to the PPM and its express, highlighted (1) disclaimers of a fiduciary duty and (2) disclosures of the existence of conflicts of interest between LeaseCo and the investors with respect to how the

properties would be managed.  (Depo. at 154-55, 164-70).  Nothing in his report or testimony shows any consideration of the investors' Purchase Agreement, which was expressly based on the terms of the PPM.

Courts, of course, read contract documents together and as a whole.  *Goldweber v. Harmony Partners, Ltd.,* 2010 WL 3702508, at *4 (S.D. Fla. Sept. 16, 2010).  They give effect and meaning to all provisions.  *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251 (S.D. Fla. 2017).  Larkin did neither, and he should not be allowed to now tell the jury something he would never tell his paying clients in the real world—that is, tell his clients:  "do not worry about the terms and conditions of the contracts you will have to sign to do this particular section 1031 deal, because you will be owed a fiduciary duty by the property manager and there will be no conflicts of interest, regardless of what your contracts say."

Indeed, Larkin specifically opines that CBRE owed a fiduciary duty to maximize the economic interests of the investors, based on his assumption there would not be any conflict of their interests and those of LeaseCo's with respect to management of the property.  (Depo. at 95-96).  But that is contrary to the express contract terms the investors agreed to, which specified there *would* be conflicts of interests and that the properties would be operated in *LeaseCo's* own interests, which might *not* be in the best interests of the investors.  (*See* ECF 215 ¶¶ 4, 5) (citing East Broward PPM, ECF 189-14 at 55, 66)).

As such, Larkin's opinion that CBRE owed a fiduciary duty to the investors to maximize their economic interests impermissibly negates the express and unambiguous terms of the investors' agreement that the properties would be managed in the best interests of LeaseCo rather than the investors and constitutes improper extrinsic evidence varying the parties' contract terms.  *See, e.g.*, *United States v. City of Miami, Fla.,* 115 F.3d 870, 874 (11th Cir. 1997) (expert's testimony insufficient when it was premised on incorrect assumptions); *see also Harris Corp. v. Giesting & Assocs., Inc.,* 297 F.3d 1270, 1271 (11th Cir. 2002) (court improperly admitted extrinsic evidence which effectively negated an unambiguous clause of the contract).

Finally, Larkin offers equally unreliable opinions about the legal duties CBRE purportedly owed to the investors under the loan documents, saying those contracts imposed a fiduciary duty by CBRE to the investors to assure that LeaseCo was properly using the operating monies and not transferring them before operating expenses were paid.  (Depo. at 171-72)**.**  In doing so, Larkin essentially relies only on selected provisions from the East Broward cash

7

management agreement requiring LeaseCo to pay operating expenses; by his own admission, he does not take into account other provisions of that agreement that expressly limit CBRE's duties. (*Id.* at 174-75).

He also admits that the particular provision of the East Broward cash management agreement upon which he based his fiduciary duty opinion is *not* in the cash management agreements for three of the six properties at issue here.  (*Id.* at 180-81).  On their face, those agreements did *not* require LeaseCo to pay operating expenses in the first instance.  The purported contractual requirement for the East Broward property with respect to payment of operating expenses, however, is an essential foundation for his duty and breach of duty opinions with respect to all of the properties.

> ### 2. Larkin points to no objective standard or authority to support his opinion that a fiduciary duty existed here.

Larkin attempts to bolster his legal opinion of the existence of a fiduciary duty by CBRE to the TIC investors under the PMA (to which the investors were not a party) by opining that this duty also exists by virtue of the tax structure of a section 1031 transaction and by making vague references to industry standards for property managers in general.  These opinions also should be excluded.

To begin with, neither of these matters can be relied on by an expert to create an implied fiduciary duty that contravenes the investors' express agreement that (1) "**NO FIDUCIARY DUTY**" would be owed to them in this particular section 1031 investment and (2) there would be conflicts with their interests in the management of the properties.  (*See* ECF 215 ¶ 3 (citing East Broward PPM, ECF 189-14 at 55)).

Although Larkin concludes there was no binding agreement by the investors to these terms of the PPM, there was.  *See Burger King Corp. v. Austin*, 805 F. Supp. 1007, 1020 (S.D. Fla. 1992) (contract provision disclaiming fiduciary duty was controlling); *Mac-Gray Servs., Inc. v. DeGeorge*, 913 So. 2d 630, 632-33 (Fla. 4th DCA 2005) (requiring directed verdict because contract provisions precluded implied fiduciary duty); *see also BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 652, 661-62 (11th Cir. 2016) (affirming summary judgment where claim was negated by disclosures in private placement memorandum).

Because Larkin's opinion rests on an incorrect assumption regarding (1) the supposed lack of a binding agreement by the investors to the terms of the PPM and (2) the absence of any

conflicts of interest in the management of these properties, it is unreliable.  *See, e.g., City of Miami*, 115 F.3d at 873-74 (expert testimony lacked probative value as matter of law when it was premised on incorrect assumptions).  In all events, Larkin can point to nothing other than his own *ipse dixit* in opining about the fiduciary duties owed to the investors under this particular section 1031 investment.

Although Larkin opines that such duties exist as a result of the investors' purported "unique[] dependen[cy]" on CBRE under a section 1031 Master Lease tax investment, (Report at 4, 5, 8-9, 15), he admits he is not a tax expert or an expert on the specific IRS regulation he relies on for his "dependency" assertion.  (Depo. at 14-15).  Nor is he even an expert in these types of investments, as he routinely refers his clients to tax lawyers and tax accountants for advice with respect to the "actual mechanism" of this type of investment.  (*Id.*).

In fact, his assumption about the investors' "unique[] dependen[cy]" upon CBRE – a foundational assumption for his duty and breach of duty opinions – rests on what he has been told in the past by unidentified tax experts about these types of investments.  *See* (Depo. at 15-17).  As demonstrated in subsection II(b)(3) below, his opinion based on legal issues that others have discussed with him is unreliable.

Furthermore, although generally referencing industry standards as imposing a fiduciary duty to the investors by CBRE, Larkin does not identify any specific industry standards or practices for evaluating section 1031 investments with respect to fiduciary duties of the property managers, much less a property manager under contracts such as these investors executed.  To the contrary, he admits "That's the problem.  There are no clear standards [and] no clear definitions."  (Depo. at 87).

An expert offering opinions such as Larkin's must, however, demonstrate that a specific, objective industry-wide standard exists as to the specific issue on which he is opining and demonstrate how that standard applies to the facts of the case.  *See Kaufman v. Pfizer Pharm., Inc.*, 2011 WL 7659333, at *9 (S.D. Fla. Aug. 4, 2011) (expert must identify an objective, established industry standard); *Birge v. Dollar Gen. Corp.*, 2006 WL 5175758, at *12 (W.D. Tenn. Sep. 28, 2006) (standard of care testimony excluded where expert could point to no specific safety measure established by industry standard); *Grdinich v. Bradlees*, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999) (expert testimony excluded where expert could point to no specific standard for situation in question promulgated by an industry group).

In short, the expert must do more than say the magic words that his opinion is based on industry standards or practices. He must demonstrate that a particular industry standard required the party to act in a particular manner. *In re Pempro Prods. Liab. Litig.*, 2010 WL 5576305, at *2 (E.D. Ark. June 29, 2010) (without a specific standard, experts' testimony "could only be a subjective opinion on what they believed Defendants could have done rather than what industry or governmental standards require them to do"). Larkin never does this.

Expert testimony that fails to meet these requirements fails under *Daubert* because it amounts to nothing more than the expert's subjective opinion on the issue. *See, e.g., Lasorsa v. Showboat: The Mardi Gras Casino*, 2009 WL 2929234, at *4 (D. N.J. Sept. 9, 2009) (gist of expert's report was that, had he "been in defendants' position, he would have handled things differently"); *Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434, at *5 (E.D. Pa. Dec. 18, 2002) (expert testimony excluded where expert lacked a methodology that could be probed or tested and expert's testimony amounted to expert's instinctive reaction to a set of facts); *In re Diet Drugs*, 2001 WL 454586, at *10 (E.D. Pa. Feb. 1, 2001) (even if expert is qualified, without a valid methodology, expert's subjective opinion, even if informed by experience, is inherently unreliable).

Larkin does not point to any industry or government standard saying property managers acting under any Master Lease in any section 1031 investment owe a fiduciary duty to the TIC investors. He points to nothing in the IRS regulations saying any such thing. He points to no industry standard requiring such a fiduciary duty where such duties have been expressly disclaimed in the parties' written agreement. And the Plaintiffs here were expressly advised that the property would not be managed in their interests.

Hence, Larkin should be precluded from telling the jury that industry standards establish such a duty on CBRE here.

### 3. Larkin relies on unreliable evidence of conversations with unidentified tax experts.

Instead of pointing to some objective, authoritative published standard, Larkin points to random conversations with unidentified tax experts to support his understanding of the supposed dependency of TIC investors on the property manager in a section 1031 investment and the resulting fiduciary duty of the property manager to the investors. He admits his opinion that section 1031 made the TIC investors dependent on CBRE is derived "from discussing that with

*tax attorneys and tax accountants who had advised me this is how the law is interpreted.* And then I take that and apply it to the commercial operations of the industry. That's it." (Depo. at 16) (emphasis added). But this is an improper and unreliable basis for Larkin to opine that a fiduciary duty existed in this particular transaction with these particular contracts.

Those non-witnesses are not available to be cross examined, their qualifications are not subject to scrutiny, and the reliability of their opinions has not been tested. It is true that, under Federal Rule of Evidence 703, experts may in some cases rely on information that is not in evidence, where the information is "of a type reasonably relied upon by experts in the particular field." But there is no evidence that is the case here.

To the contrary, Larkin's questioning of others is akin to survey evidence, which is consistently excluded where requirements for reliability are not present. *See, e.g., Floorographics v. News American Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 177-78 (D. N.J. 2008) (expert testimony inadmissible where expert personally knew the interviewees, interviewees were aware of the party for whom the survey was being conducted, and verbatim records of their responses were not kept); *Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (survey unreliable where persons surveyed did not constitute representative sample); *Jackson v. Nat'l Action Fin. Servs.*, 441 F. Supp. 2d 877, 886-87 (N.D. Ill. 2006) (survey unreliable and irrelevant because, among other things, key question was not defined or explained and was too ambiguous to provide insight); *Recreational Dev. of Phoenix, Inc. v. City of Phoenix*, 220 F. Supp. 2d 1054 (D. Ariz. 2002) (expert report was not sufficiently reliable where it relied on anecdotal evidence derived from random interviews).

Neither the Court nor the jury knows what questions were asked by Larkin of these out-of-court individuals, nor precisely what information was provided to them to give context to the questions. Nor are their exact statements to Larkin known or what caveats they may have attached to their statements. There is simply no way for the Court or jury to judge the reliability of Larkin's opinions based on the out-of-court views of unknown persons whose own specific expertise or experience on the particular legal issues presented in this case is unknown.

Where, as here, indicia of reliability are lacking, evidence by an expert of the views of unidentified persons is inadmissible. Larkin cannot bolster his qualifications by acting as a mere conduit, channeling the opinions of others when he himself has no background in the specific areas about which he is testifying. *Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558, 573

11

(S.D.N.Y. 2007) (expert witness may not act as conduit for unproduced expert); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (expert may not be mouthpiece of witnesses upon whose statements or opinions the expert purports to base his opinion in an area where he is not qualified).

Rather, a precondition of reliance on out-of-court statements is that Larkin himself be an expert on the specific issue.  He admittedly is not – that is why he was talking with tax lawyers and tax accountants in the first place and why he refers his clients to them for more specific information about how section 1031 investments actually work.

* * *

All of the foregoing shows that Larkin's opinion is a litigation-driven, unreliable opinion – the kind of opinion he never would dream of offering his non-litigation clients to guide their investment decisions in the real world.

Larkin does not suggest, for example, that, in the real world consulting he does, he would evaluate an investment, and the rights and risks of the potential investor, without also at least taking into account the express terms of the actual contracts the investor would be required to sign in order to make the investment.

He does not say it is common in his experience, in the industry, or in the real world to advise a property manager that it must act as a fiduciary for section 1031 investors, even though they have explicitly agreed that no fiduciary duties will be owed to them and that the property invested will be managed in the Master Lessee's own interests, which may be in conflict with the interests of the investors.

He does not identify any specific instance in which he advised a client (or knows other experts have advised a client) that it would be owed a fiduciary duty by a property manager, and hence should proceed with the investment, despite the disclaimers and disclosures in the PPM to which it would have to execute an express written acknowledgment and agreement in order to make the investment.

Because Larkin did not employ the same degree of intellectual rigor in his litigation opinions that he would in advising outside clients outside the courtroom, and instead offers only a subjective opinion based on a selective, litigation-driven and one-sided view of the contract documents, his testimony is unreliable.

12

### III.   **Larkin's Opinion That CBRE "Knew" Of The Misappropriation Is An Inadmissible "State Of Mind" Opinion.**

Larkin repeatedly opines that CBRE "knew," was "aware," and "learned" that monies were being "misappropriated" by LeaseCo.  (Report at 4 n.2, 5, 15).  Larkin defines "misappropriation" in his report as "transferring or otherwise removing funds from the Florida Properties' bank accounts when the entity or person taking the funds is not entitled to take those funds at the time they were transferred or otherwise removed."  (Report at 4 n.1).  Larkin is rendering an inadmissible personal opinion about CBRE's knowledge of the "misappropriation."

An opinion on the defendant's knowledge of wrongdoing is not a proper question for ex parte questions.  *See Omar v. Babcock*, 177 F. App'x 59, 63 (11th Cir. 2006); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *4-5 (M.D. Fla. July 20, 2009); *see also Woodhull v. Cty. of Kent*, 2006 WL 2228986, at *6 (W.D. Mich. Aug. 3, 2006) ("[n]o one, including an expert, can delve into a defendant's subjective state of mind"); *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio 2013) ("No expert . . . knows a party's state of mind," and an expert, therefore, "cannot opine on a party's state of mind;" holding that expert testimony that the defendant "knew" a co-defendant had used proprietary information "is obviously an evaluation of [the defendant's] state of mind").  As one court put it, testimony on the mental state of another "seems more suited to the mind-reader's booth on a carnival midway than to the witness box in a courtroom."  *S.E.C. v. Handgis*, 1995 WL 133769, at *1 (S.D.N.Y. Mar. 28, 1995).

The court's decision in *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24 (D.D.C. 2007), illustrates the point.  In that case, the plaintiff brought a civil rights action arising from his arrest for "fare evasion" on the Washington D.C. rail system.  The plaintiff sought to present an expert who would testify on proper police procedures relating to arrest.  Granting in part the defendant's motion in limine, the court excluded testimony that the defendant's actions were committed purposefully and "wittingly," and that the defendant acted with "design."  *Id.* at 29-30.

So too, Larkin cannot opine that CBRE "knew" about the "misappropriation" of funds by LeaseCo.  These are the type of ultimate issues of fact for the jury to decide based on the factual evidence before it.  *See Wiand v. Wells Fargo Bank, N.A.*, 2014 WL 1819616, at *4 (M.D. Fla.

May 7, 2014) (expert is not permitted to opine on the ultimate factual issue of whether or not party had knowledge of fraudulent activities).  Indeed, Larkin's definition of "misappropriation" assumes in the first instance that LeaseCo was not entitled to take these funds from any of the six properties.  This is an ultimate factual issue for the jury to decide.

**IV.**   **Larkin's Further Opinions That CBRE "Should Have Known" It Owed A Fiduciary Duty To The Investors And "Should Have Known" LeaseCo Was "Misappropriating" The Operating Monies Are Irrelevant To The issues In This Case.**

Larkin's "should have known" opinions, (*see, e.g.*, Report at 15), are not relevant to the legal and factual issues in the case, as required for admissibility.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir. 1999) (proffered expert testimony "must meet the legal as well as the substantive issues in the case"). In particular, his conclusory opinions that CBRE "should have known" it owed the investors a fiduciary duty to manage the properties in their best interests and of the "misappropriation" by LeaseCo of the operating monies are negligence issues that are irrelevant to Plaintiffs' intentional tort claims.

The sole negligence issue raised by Plaintiffs is whether CBRE should have known that its employee, Gloria Hernandez, was acting wrongfully with respect to and assisting the "misappropriation" by LeaseCo.  Larkin's "should have known" opinions do not go to that issue.

**V.**   **Larkin's Testimony Is Impermissible Closing Argument For Plaintiffs Clothed With The Imprimatur Of An "Expert."**

Larkin's proffered testimony demonstrates he largely is simply reviewing the same evidence the jury will consider and presenting his "spin" on it – a selective and one-sided view of the evidence much like Plaintiffs' counsel undoubtedly will do in closing argument.  This is advocacy, not admissible expert evidence.  *See Hayes v. MTD Prods., Inc.*, 518 F. Supp. 2d 898, 901 (W.D. Ky. 2007) (expert's report read more like counsel's closing argument than unbiased expert assessment).

As an example, Larkin dismisses the contractual disclaimers in the PPM.  He characterizes the disclaimers of a fiduciary duty as being "buried" within the PPM.  (Depo. at 166-67).  The jury, of course, can look at the document and see for itself how boldly and frequently those disclaimers are set forth.  But the jurors could be misled by Larkin's opinion into believing the disclaimers should have been set forth in some different manner to be proper.

Larkin further dismisses the PPM and its disclaimers by characterizing the PPM as nothing more than a "very boringly and poorly written marketing piece," despite conceding that that both Plaintiffs signed an Acknowledgment and Agreement to the PPM, with its disclaimers and disclosures.  (Depo. at 153-55, 164-68).

Further, Larkin does not consider the Acknowledgments and Agreements "particularly" meaningful because he can "virtually guarantee" that the Plaintiffs did not read them or the PPM before signing them.   (Depo. at 165-66).   Under the law, however, these disclaimers and disclosures are binding on Plaintiffs whether they were read or not.  Allowing Larkin to tell the jury otherwise would misinform the jury.  *See, e.g.*, *BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 660-62 (11th Cir. 2016) (disclosures and risk factors in PPM binding on investors where "[s]ubscription [a]greement was intended to be executed after reading and reviewing the PPM"); *Hansen v. Wheaton Van Lines, Inc.*, 468 F. Supp. 2d 1339, 1346 (S.D. Fla. 2006) ("An individual's failure to read or investigate the terms of the contract she signed is not a defense to [its] enforcement.").

As yet another example, Larkin's opinions that CBRE purportedly knew about the LeaseCos' "misappropriation" of operating expenses are nothing more than his own subjective view, based on the same evidence the jury can evaluate.  His imprimatur as an "expert" on a quintessential question of fact for the jury, based on all of the evidence they will hear at trial, would be improper.

Courts regularly refuse to permit this type of testimony.  In *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998), for example, the Eleventh Circuit upheld the exclusion of an expert statistician's characterizations of the documentary evidence as reflecting collusion.  The Court noted that, unlike the witness' statistical opinions, his characterizations would not assist the trier of fact, who was "entirely capable of determining whether or not to draw such conclusions without any technical assistance from [the expert]."

Other courts have similarly held.  *See Frazier*, 387 F.3d at 1262-63 ("[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."); *In re Pempro Prod. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) ("Having an expert witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, "was inappropriate "expert" testimony), *rev'd in part on other grounds*, 586 F.3d 547 (8th Cir. 2009); *In re Rezulin*

*Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (testimony improper because it described lay matters that a jury is capable of understanding and deciding without the expert's help; expert merely repeated facts or opinions stated by other potential witnesses or in documents produced in discovery and drew simple inferences from documents produced in discovery).

Larkin's proposed testimony is merely a selective rehash of certain of the evidence, stated from Plaintiffs' perspective. Its sole purpose is to suggest that Plaintiffs' "side" of the case should be accepted by the jury rather than CBRE's "side." *Daubert* and Rule 702 apply precisely to eliminate the danger that a jury may place undue weight on the opinion of an expert, rather than viewing the facts for themselves and applying the court's instructions of law to those facts.

The prejudicial effect of admitting such opinions is substantial. Plaintiffs seek to bolster and enhance the testimony of Plaintiffs' witnesses and argument by Plaintiffs' counsel by having an expert "agree" with Plaintiffs' characterization of the facts. Because of the powerful and potentially misleading effect of expert evidence, see *Daubert*, 509 U.S. at 595, Larkin's expert opinions, even if otherwise admissible, should still be excluded by applying Rule 403. *See Frazier*, 387 F.3d at 1263.

## CONCLUSION

Larkin proposes to offer a number of opinions. (*See, e.g.*, Report at 5, 15-16). All of them, while sometimes couched in terms of proper management of the properties, rest on his opinion that CBRE owed and breached a legal duty to advise the Plaintiffs regarding the misappropriation of funds. Other opinions, on matters such as failing to pay vendors, all flow from and are intertwined with those underlying opinions on duty and breach. As such, all of these opinions constitute impermissible opinions on legal issues. Still other opinions simply tell the jury what result to reach on the ultimate issues and constitute impermissible legal conclusions.

His opinions are also inadmissible because they amount to unsupported subjective opinions based on a selective rehash of the facts from Plaintiffs' perspective, ignoring or contradicting undisputed record facts, speculating on CBRE's mental state or offering irrelevant opinions on what CBRE "should have known." Larkin's opinions are unreliable and amount to nothing more than the closing argument of Plaintiffs' counsel, couched in terms of expert

16

testimony.  This will not assist the trier of fact.  His opinions should be excluded and he should not be allowed to testify.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1, I, undersigned counsel for Defendant CBRE, Inc., Thomas Meeks, HEREBY CERTIFY that I spoke with counsel of record for Plaintiffs and Plaintiffs do not agree to the relief requested in this motion.

*s/ Thomas Meeks*

Thomas Meeks (314323)
Email:  tmeeks@carltonfields.com
Yolanda P. Strader (70212)
Email: ystrader@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
100 SE Second Street, Suite 4200
Miami, Florida 33131
Tel:     (305) 530-0050
Fax:     (305) 530-0055

Sylvia H. Walbolt (33604)
Email: swalbolt@carltonfields.com
D. Matthew Allen (866326)
Email: mallen@carltonfields.com
Mariko Shitama Outman (106681)
Email: msoutman@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
Corporate Center Three at International Plaza
4221 w. Boy Scout Blvd. – Suite 1000
Tampa, Florida 33607-5780

***Co-Counsel for Defendants CBRE, Inc.***

*s/ Hardy L Roberts*

Hardy L. Roberts, III (0062545)
Email: hroberts@careyomalley.com
CAREY O'MALLEY WHITAKER
MUELLER ROBERTS & SMITH
712 S. Oregon Avenue
Tampa, Florida 33606

***Co-Counsel for Defendants CBRE, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2018, I electronically filed the foregoing Motion with the Clerk of the Court through the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*s/ Thomas Meeks*
Attorney

17

SERVICE LIST

Kevin P. Jacobs, Esq.
Email: kjacobs@homerbonner.com
Gregory J. Trask, Esq.
Email: gtrask@homerbonner.com
HOMER BONNER JACOBS, P.A.
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Tel: (305) 350-5100
***Counsel for Gloria Hernandez***

David R. Softness, Esq.
Email: david@softnesslaw.com
David R. Softness, P.A.
201 South Biscayne Boulevard, Suite 2740
Miami, Florida 33131
Tel: (305) 341-3111
***Counsel for Defendant, Actuarial Risk Management, Ltd.***

Jason P. Hernandez, Esq.
Email: jhernandez@stearnsweaver.com
Mary Barzee Flores, Esq.
Email: mbarzeeflores@stearnsweaver.com
Ryan T. Thornton, Esq.
Email: rthornton stearnsweaver.com
Joseph J. Onorati, Esq.
Email: jonorati@stearnsweaver.com
Eugene E. Stearns, Esq.
Email: estearns@stearnsweaver.com
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: 305-789-3200
Facsimile: 305-789-3395
***Attorneys for Plaintiffs and the Class***

18