## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-61218-CIV-DIMITROULEAS/SNOW

Cabot East Broward 2 LLC and
Cabot East Broward 34 LLC, individually
and on behalf of all others similarly situated,

      Plaintiffs,

v.

Carlton P. Cabot, Timothy J. Kroll,
Cabot Investment Properties, LLC,
Cabot East Broward LeaseCo, LLC,
Cabot North Orange LeaseCo, LLC,
Cabot Oak Grove Asset Manager, LLC,
Cabot Trafalgar/Avion LeaseCo, LLC,
Cabot Cypress Creek LeaseCo, LLC,
Cabot North University LeaseCo, LLC,
CBRE, Inc., and Gloria Hernandez,

      Defendants.

---

### PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH DEFENDANTS CBRE, INC. AND GLORIA HERNANDEZ AND SUPPORTING MEMORANDUM OF LAW

Plaintiffs Cabot East Broward 2 LLC and Cabot East Broward 34 LLC, on behalf of themselves and the Class, hereby request the entry of an Order pursuant to Fed. R. Civ. P. 23: (1) preliminarily approving the Settlement Agreement with Defendants CBRE, Inc. ("CBRE") and Gloria Hernandez ("Hernandez") which is attached hereto as Exhibit 1 (the "Settlement"); (2) preliminarily approving the proposed plan of allocating settlement proceeds detailed below; (3) approving the proposed Notice of Settlement attached as Exhibit 2 (the "Settlement Notice"); (4) approving Class Counsel's proposed method of delivering the Settlement Notice to the Class; (5) approving City National Bank of Florida to serve as Escrow Agent and maintain the account in which the settlement funds will be held, in accordance with the proposal attached as Exhibit 3; and (6) establishing certain deadlines concerning the final approval process as proposed herein and setting a date for a final approval hearing.  Evidentiary support for this motion is provided in the Declaration of Class Counsel attached as Exhibit 4.

## INTRODUCTION

After more than two years of vigorously-contested litigation between the Plaintiffs and Defendants CBRE and Hernandez, the Plaintiffs seek preliminary approval of a Settlement which will confer immediate and substantial monetary benefits upon the Class certified herein. Under the Settlement, CBRE has agreed to pay $100 million – 71.6% of the Class' damages – in full satisfaction of the claims asserted against CBRE and its former employee Hernandez. Empirical studies have shown that class action settlements typically recover less than 10% of the class members' total estimated losses, rendering the outcome in this case truly exceptional. The Settlement is an outstanding result for the Class which easily satisfies the standard for preliminary approval, as it is "within the range of possible approval" to authorize distribution of a notice of settlement to the Class.  The Settlement should also ultimately receive final approval, as it is undeniably fair, reasonable, and adequate.

## BACKGROUND

### A.      Summary of Case

The Plaintiffs and the Class were investors in six commercial properties in Florida and became the victims of a lengthy multi-million-dollar embezzlement scheme committed by Defendants Carlton P. Cabot and Timothy J. Kroll, through corporate entities they controlled. The six properties are collectively referred to as the "Florida Properties" and consist of:

| | |
|---|---|
| East Broward Corporate Center | 100 and 110 East Broward Blvd, Ft. Lauderdale, FL 33301 |
| Cypress Creek Tower | 800 West Cypress Creek Road, Ft. Lauderdale, FL 33309 |
| Trafalgar / Avion | 5300 N.W. 33rd Avenue and 2200 N.W. 50th Street, Ft. Lauderdale, FL 33309 |
| North University Preferred Exchange | 3111 North University Drive, Coral Springs, FL 33065 |
| North Orange Wachovia Tower | 20 North Orange Avenue, Orlando, FL 32801 |
| Oak Grove | 7575, 7585, and 7595 Baymeadows Way, Jacksonville, FL 32256 |

In 2015, Cabot and Kroll were indicted for their crimes and each later pled guilty to embezzling millions of dollars from the six Florida Properties.  They are both now in federal prison.

In the present case, the Plaintiffs and the Class have sued Cabot, Kroll, and their entities, as well as others.  They allege that Cabot and Kroll could not have committed the embezzlement without the assistance or inaction of third parties, including Defendants CBRE and Hernandez. CBRE was the property manager of the six properties when the embezzlement scheme began, and it subsequently hired Hernandez to be the on-site manager of two of the six properties and assist in the supervision of the others.

Cabot, Kroll, and their entities never appeared and Clerk's Defaults have been entered against them. [D.E. 44, 53, 70-76]. Class Counsel intends to convert the defaults into judgments, but it is unlikely that any recovery will be had as a result. Neither Cabot, Kroll, nor their entities are believed to have any assets that could be used to satisfy part or all of a judgment. Ex. 4 (¶ 6).

That leaves only the Plaintiffs' and the Class' claims against CBRE and Hernandez. Those claims seek compensatory and punitive damages from CBRE and compensatory damages from Hernandez. CBRE and Hernandez have vigorously denied any liability for those claims and have asserted a number of defenses thereto.

### B.    Relevant Procedural History

The Plaintiffs filed their Class Action Complaint in this matter on June 7, 2016 [D.E. 1]. CBRE and Hernandez jointly responded with a Motion to Dismiss, which was denied. [D.E. 84]. The Plaintiffs then filed an Amended Class Action Complaint on November 7, 2017 [D.E. 163].

On March 21, 2018, this Court granted Plaintiffs' Motion for Class Certification and certified a Class consisting of the 179 limited liability companies through which investments were made in the Florida Properties. Order Granting Motion for Class Certification [D.E. 203]. The Court also certified six Sub-classes for management purposes on the issue of damages – one for each property – to enable damages to be determined on a property-by-property basis. *Id.* In addition, the Court appointed the Plaintiffs' managing members as Class Representatives and Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. as Class Counsel. *Id.*

On April 2, 2018, this Court approved the parties' joint proposed Notice to the Class in accordance with Fed. R. Civ. P. 23(c)(2)(B) [D.E. 211], and between April 4 and 5, 2018, the Notice was mailed to all 179 Class Members. None opted out of the Class. Ex. 4 (¶ 19).

On April 4, 2018, CBRE and Hernandez jointly petitioned the Eleventh Circuit for permission to file an interlocutory appeal of the Order Granting Motion for Class Certification. That Petition was denied on May 17, 2018. [D.E. 231].

On April 16, 2018, CBRE and Hernandez also filed Motions for Summary Judgment as to the claims asserted against them and certain of their defenses. [D.E. 214, 216].

On May 9, 2018, the two Class Representatives and Class Counsel participated in an all-day mediation session with CBRE, Hernandez, their respective counsel, and their insurers. The mediator was Brian F. Spector, an experienced, neutral mediator. The mediation session was unsuccessful but laid the groundwork for further settlement discussions. Ex. 4 (¶ 22).

On June 8, 2018, the Plaintiffs and CBRE each filed motions to exclude or preclude certain expert testimony.  On July 26, 2018, this Court issued a series of Orders thereon which granted in part and denied in part the motion to exclude the testimony of Plaintiffs' expert Jeremy S. Larkin [D.E. 281], denied the motion to exclude the testimony of Plaintiffs' expert Ronald A. Oxtal, MAI [D.E. 282], granted in part and denied in part the motion to exclude the testimony of Plaintiffs' expert Patrick F. Gannon, CPA, ABV, CFF, CFA [D.E. 283], and granted in part and denied in part the motion to exclude certain testimony of CBRE experts Alan S. Baseman and Lori A. Bluett [D.E. 284].

On August 3, 2018, the Class Representatives and Class Counsel participated in a second all-day mediation session with CBRE and its counsel, again with the assistance of Mr. Spector. That mediation session resulted in a settlement as to the claims against CBRE and Hernandez, the material terms of which were documented in a Memorandum of Understanding, subject to Court approval.  The parties then worked cooperatively to prepare the Settlement Agreement and proposed Settlement Notice attached hereto.  Ex. 4 (¶ 24).

The Motions for Summary Judgment were fully briefed and pending a decision when the Settlement was reached, and they have each since been denied as moot.  [D.E. 286].

### C.       The Plaintiffs' and Class' Damages

In Florida, the goal of compensatory damages in tort actions such as the present case is "to restore the victim to the position he would be in had the wrong not been committed." *Gregg v. U.S. Industries, Inc.*, 887 F.2d 1462, 1467 n. 4 (11th Cir. 1989) (citations omitted). Thus, consistent with that principle, the Plaintiffs' and the Class' sought recovery pursuant to the "benefit-of-the-bargain" theory of damages. *Id.* at 1466 & 1467 n.4.

In order to assist the Plaintiffs and the Class in evaluating their compensatory damages, Class Counsel engaged the services of two independent experts, namely, Ronald A. Oxtal, MAI and Patrick F. Gannon, CPA, ABV, CFF, CVA.  Mr. Oxtal prepared cash flows and appraisals projecting how each of the Florida Properties would have performed but for the embezzlement, and what the current market value of each of the properties would be but for the embezzlement. Mr. Gannon then took that information and used it to perform a variety of forensic analyses. He concluded that, but for the wrongdoing, each of the Florida Properties would have generated sufficient cash flow to survive the Great Recession and avoid the foreclosures which occurred. He also both identified and quantified the economic damages attributable to the embezzlement – as opposed to damages caused by the Great Recession – on a property-by-property basis.

Though Messrs. Oxtal and Gannon used the same methods to assess the damages sustained by each property, the process was extraordinarily time consuming and complicated. That is because the amounts embezzled from each property differed and the properties themselves are different, all of which affected the amount of damages sustained. Ex. 4 (¶ 12).

East Broward Corporate Center, for instance, is located in downtown Fort Lauderdale and was a Class A property when the embezzlement began. It consists of a 24-story office tower and an associated retail annex, with a combined total of 342,465 square feet of net rentable area. But for the embezzlement, it would be worth roughly $94,200,000 today. [D.E. 256-3, p. 27]. Cypress Creek Tower, by contrast, is located several miles north of downtown Fort Lauderdale in the Cypress Creek submarket, and was a Class B property when the embezzlement began. It is also a much smaller property, consisting of a 5-story office building with 62,476 square feet of net rentable area. But for the embezzlement, it would be worth roughly $8,790,000 today. [*Id.* at 129, 138].

Together, Mr. Oxtal, Mr. Gannon, and their respective teams dedicated over 4,000 hours to sorting through the above differences and assessing the damages sustained by each property. They also prepared lengthy reports detailing their findings, which collectively total more than 1,000 pages including exhibits. Ex. 4 (¶ 12); [D.E. 256-3, 256-5].

With the aid of Mr. Oxtal's cash flows and appraisals, Mr. Gannon determined that the Class suffered benefit-of-the-bargain losses as a result of the embezzlement in the form of unpaid base rents, lost reserves, and lost equity. He found the losses sustained by some properties were greater than others, which was not surprising in light of the differences referenced above. Specifically, he calculated the economic damages attributable to the embezzlement as follows:

| Property | Economic Damages Attributable to Embezzlement |
|---|---|
| East Broward Corporate Center | $68,887,732 |
| Cypress Creek Tower | $5,669,651 |
| Trafalgar / Avion | $9,011,276 |
| North University / Preferred Exchange | $20,244,526 |
| North Orange Wachovia Tower | $22,401,393 |
| Oak Grove | $13,382,379 |
| Total | $139,596,957 |

Ex. 4 (¶ 13); [D.E. 256-5, pp. 8-12].

### D.     The Settlement

As noted above, in May and August 2018, the parties participated in mediation sessions with the assistance of Brian F. Spector, an experienced, neutral mediator.  Ex. 4 (¶¶ 22, 24). Those sessions resulted in the Settlement Agreement attached hereto, which was executed as of August 17, 2018.  *Id.*  The key terms of the Settlement are as follows, with capitalized terms having the meanings defined in the Settlement Agreement:

- Within 5 calendar days after Preliminary Approval of the Settlement, Class Counsel, CBRE, and the banking institution approved to serve as Escrow Agent shall enter into an Escrow Agreement pursuant to which an Escrow Account is to be established as a "qualified settlement fund" to receive and maintain the Settlement Amount and any interest thereon for the benefit of the Class. Ex. 1 (¶¶ 7, 9).

- Within 10 calendar days after that Escrow Account is established, CBRE shall pay the entirety of the Settlement Amount – $100 million – into the Escrow Account, by wire transfer. *Id.* (¶ 8).

- The Plaintiffs shall then submit to the Court a Motion for Final Approval and for entry of a Final Order and Judgment which, among other things, grants final approval of the Settlement pursuant to Fed. R. Civ. P. 23(e) and directs that all claims against CBRE and Hernandez be dismissed with prejudice as of the Effective Date of Settlement, which is defined as the earlier of: (i) the day after the deadline to file an appeal from the Final Order and Judgment, if no appeal as to the Settlement is filed; or (ii) the day after appellate rights as to the Final Order and Judgment have been exhausted, if an appeal as to the Settlement is filed and the approval thereof is affirmed. *Id.* (¶ 13).

- The Plaintiffs and other Class Members are also providing and receiving certain mutual releases of all claims, known or unknown, relating to the Florida Properties, upon the Effective Date of Settlement.  *Id.* (¶ 17).

- Prior to the Effective Date of Settlement, the Settlement Amount may not be used for any purpose; however, any interest earned thereon may be used to pay necessary and reasonable administrative expenses, subject to this Court's prior approval.  Upon the Effective Date of Settlement, however, CBRE shall have no right to reversion of any portion of the Settlement Amount, including any interest earned thereon. *Id.* (¶¶ 12, 16).

- Following the Effective Date of Settlement, monetary disbursements from the Settlement Amount shall be made for attorneys' fees, litigation costs, and Class Representative incentive awards, as directed by the Court. In addition, disbursements from the Settlement Amount and any interest thereon which is not needed to cover administrative and other expenses shall be made to the Class Members in accordance with a plan of allocation which the Court shall authorize. *Id.* (¶¶ 14, 19).

### E.      The Proposed Plan of Allocation

Class Counsel proposes to use Mr. Oxtal's and Mr. Gannon's damage calculations as the basis for allocating settlement proceeds among Class Members.  Under that approach, the Class Members' pro-rata share of the Settlement Amount on a property-by-property basis would be as follows, before deduction for attorneys' fees, costs, and any incentive awards:

| Property | Economic Damages Attributable to Embezzlement | Percentage of Whole | Pro-Rata Settlement Allocation Before Deduction For Attorneys' Fees, Costs, and Incentive Awards |
|---|---|---|---|
| East Broward Corporate Center | $68,887,732 | 49.35% | **$49,347,589** |
| Cypress Creek Tower | $5,669,651 | 4.06% | **$4,061,443** |
| Trafalgar / Avion | $9,011,276 | 6.46% | **$6,455,209** |
| North University / Preferred Exchange | $20,244,526 | 14.50% | **$14,502,126** |
| North Orange Wachovia Tower | $22,401,393 | 16.05% | **$16,047,193** |
| Oak Grove | $13,382,379 | 9.59% | **$9,586,440** |
| Total | $139,596,957 | 100.00% | **$100,000,000** |

Ex. 4 (¶ 33).

Upon final approval of the Settlement, a formal claims process would be established through which individual Class Members may obtain a pro-rata share of the settlement allocation for their property, with pro-rata deductions for attorneys' fees, costs, and any incentive awards. For example, if Cabot Oak Grove 27 LLC owned 2.6596% of the Oak Grove property, Cabot Oak Grove 27 LLC would be entitled to submit a claim for 2.6596% of $9,586,440, minus 2.6596% of any attorneys' fees, costs, and incentive awards granted. Ex. 4 (¶ 34).

Class Counsel believes that this proposed method of allocation is the most fair and equitable way to allocate settlement proceeds among the Class Members, as it recognizes that the losses sustained by some properties as a result of the embezzlement were determined by independent experts to be greater than others.  The proposed plan of allocation will ensure that no Class Member is undercompensated relative to its economic losses, and it will also ensure that no Class Member is overcompensated relative to its losses at the expense of other Class Members. It is, by definition, a fair, reasonable, and adequate approach. Ex. 4 (¶ 35).

Class Counsel seeks preliminary approval of this proposed plan of allocation at this stage so that it may be included in the Settlement Notice and considered at the final approval hearing. We will separately move for the approval of a formal claims process and for the appointment of an independent Claims Administrator to help administer the Settlement.

## MEMORANDUM OF LAW

### I.      THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED

Federal Rule of Civil Procedure 23(e) requires judicial approval for the compromise of claims brought on a class-wide basis.  The rule requires what amounts to a two-step process: (1) the Court must preliminarily approve the proposed settlement and authorize the distribution of a notice of settlement to class members; and (2) the Court must then hold a hearing for the purpose of determining whether the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 (11th Cir. 1984). The approval of class settlements "is committed to the sound discretion of the district court." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); see generally MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41 (1995).

### A.      The Standard for Preliminary Approval

Established "public policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.*, 967 F.2d at 493 (citation omitted).  Indeed, "[s]ettlement has special importance in class actions with their notable uncertainty, difficulties of proof, and length." *Wilson v. Everbank*, N.A., 2015 WL 10857344, at *1 (S.D. Fla. Aug. 31, 2015) (citation omitted). "Settlements of [such] cases contribute greatly to the efficient use of judicial resources, and achieve the speedy resolution of justice." *Id.*

In the first step of the approval process – *i.e.*, a request for preliminary approval – the Court must make an initial evaluation of the of the fairness of the proposed settlement. The request for preliminary approval should be granted if the proposed settlement is determined to be "'within the range of possible approval' or, in other words, [if] there is 'probable cause' to notify the class of the proposed settlement." *Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *5 (S.D. Fla. May 14, 2007) (citation omitted).  These requirements are met where "the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies[,] and the settlement falls within the range of reason." *In re Checking Account Overdraft Litigation*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) (citations omitted).

"Absent fraud, collusion, or the like, a district court should be hesitant to substitute its own judgment for that of counsel" in assessing the reasonableness of a proposed settlement. *Canupp v. Liberty Behavioral Healthcare Corp.*, 447 Fed. App'x 976, 978 (11th Cir. 2011). "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to

class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing." MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.44 (1985).

Preliminary approval does not require the Court to answer the ultimate question of whether a proposed settlement is fair, reasonable, and adequate. That decision is reserved for the final approval stage, after notice of the proposed settlement has been provided to the class and the members have had an opportunity to voice their views on the settlement. *See Bennett*, 737 F.2d at 986; *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 859 (11th Cir. 2009).

### B.     The Standard for Preliminary Approval is Satisfied Here

#### 1.     The Settlement Was Negotiated at Arms-Length

On a request for preliminary approval, the first factor this Court must consider is whether the proposed settlement was negotiated at arms-length and was not the product of collusion. "There is a presumption of good faith in the negotiation process," and "[w]here the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014).

Here, the proposed Settlement was the result of extensive, arms-length negotiations by counsel well-versed in class actions and other complex litigation. It was also achieved with the assistance of an experienced, neutral mediator, further supporting the absence of collusion. Ex. 4 (¶¶ 2, 26); *see, e.g., Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (finding arms-length requirement was met where "Class Counsel and counsel for Defendants [we]re all experienced lawyers highly skilled in class action work" and "Brian F. Spector, Esq., an experienced and well-respected mediator . . ., oversaw most of the settlement process"); *Hugo on behalf of BankAtlantic Bancorp, Inc. v. Levan*, 2011 WL 13173025, at *6 (S.D. Fla. July 12, 2011) (arms-length requirement met where "sophisticated practitioners" reached a settlement "in the presence and with the assistance of an experienced mediator"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[A] mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings [a]re free of collusion and undue pressure.").

In addition, it bears noting that the Settlement in this case came late in the litigation – after the close of fact and expert discovery, the filing of motions for summary judgment, rulings on motions to exclude certain expert testimony, and two all-day mediation sessions. The Settlement was achieved virtually on the eve of trial, while the parties were focused on preparing their cases and were fully informed about their prospects of success. Ex. 4 (¶ 27).

- 9 -

Further, and perhaps most importantly, CBRE has agreed to pay a total of $100 million to settle the claims asserted against it and Hernandez.  That is a substantial sum which reflects good faith arms-length negotiations, not collusion.  While a jury might have awarded more, the Settlement Amount reflects a reasonable reduction in light of the potential risk of loss and the time that would have been required to obtain recovery through litigation.  Ex. 4 (¶¶ 28, 31).

Class Counsel also respectfully submits that the Settlement has no obvious deficiencies. CBRE has agreed to pay an amount which equates to nearly 72% of the Class' total damages, the mutual releases to be exchanged are limited to claims relating to the Florida Properties, and under the proposed plan of allocation discussed above each Class Member will be treated fairly and equitably, in proportion to its losses.  Ex. 1 (¶¶ 8, 17); Ex. 4 (¶¶ 33-35).

Thus, we believe the Court can easily find the first factor relevant to preliminary approval is satisfied here.

### 2.     Whether There Was Sufficient Discovery

On a request for preliminary approval, the second factor this Court must consider is whether the parties conducted sufficient discovery before entering into the proposed settlement. Here, the answer is, unequivocally, "yes."

Class Counsel vigorously investigated and prosecuted this case for more than two years, and the Settlement was achieved only after the close of extensive fact and expert discovery:

- The parties collectively propounded 4 sets of interrogatories containing 82 individual questions, and 7 sets of requests for production seeking 203 categories of documents;

- 132 subpoenas were also issued to third-parties, including 25 subpoenas to absent Class Members;

- Roughly 160,000 documents, totaling more than 1 million pages, were ultimately produced and reviewed; and

- 15 fact witnesses, and 7 expert witnesses, were deposed in eight cities across the country.

In addition, Class Counsel settled with former Defendant Harry L. Silverman and received informal discovery from him in the form of documents and proffers.  Ex. 4 (¶¶ 10-15).

In all, Class Counsel spent literally thousands of hours on discovery in this case and devoted substantial time and resources to working with experts on both liability and damages. Through that process, Class Counsel gained more than enough information to properly evaluate the merits of the case and weigh the benefits of a proposed settlement against proceeding to trial. Ex. 4 (¶¶ 16, 27); *Francisco v. Numismatic Guaranty Corp. of Am.*, 2008 WL 649124, at *11

(S.D. Fla. Jan. 31, 2008) (extensive discovery provided "sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation") (citing cases).

Thus, we believe the Court should find the second factor relevant to preliminary approval is satisfied here as well.

### 3.    Experienced Class Counsel Believes the Settlement Agreement Should Be Approved

The third factor the Court must consider is whether Class Counsel supports the Settlement. "Courts have repeatedly recognized that settlements are highly favored in the law and will be upheld 'whenever possible because they are a means of amicably resolving doubts . . . .'" *In re Marine Hose Antitrust Litig.*, 2009 WL 10685187, at *10 (S.D. Fla. Aug. 11, 2009) (citation omitted).  Therefore, courts "properly consider[] the judgment of experienced counsel when asked to approve a class action settlement," *Perez*, 501 F. Supp. 2d at 1384, and counsel's "view . . . regarding the appropriateness of a proposed settlement is entitled to significant weight." *Hugo*, 2011 WL 13173025, at *10-11 (internal quotation marks and citation omitted).

Here, Class Counsel has extensive class action and complex litigation experience on both sides of the "v," which gives us unique knowledge and insight into such matters. Ex. 4 (¶ 2). We have achieved substantial recoveries in prior class actions, including what was at the time the largest compensatory jury verdict in the history of class actions – roughly $1.2 billion.  *Id.* The nation's pre-eminent scholar on the role of lawyers in class actions later described that remarkable achievement as follows:

> No action that I have seen approaches this one in the degree of success obtained for the class, the effort expended by class counsel, or the risk assumed. . . . Not only has class counsel recovered a $1.2 billion verdict and obtained a fund capable of fully compensating all identified class members, it has done so in the face of unprecedented risk and resistance. . . .  The investment and effort . . . is simply without equal.

*Allapattah Services, Inc. v. Exxon Corp.*, No. 1:91-cv-00986 [D.E. 2638, pp. 1-2].

In the present case, Class Counsel unhesitantly endorses the proposed Settlement, as it is a fair compromise and will confer immediate and substantial benefits on the Class. Ex. 4 (¶ 32). That endorsement should be given significant weight in the analysis, because counsel is a "unique position[] to assess the potential risks" of the litigation and the relative benefits of the Settlement.  *Shaw v. Set Enters., Inc.*, 2017 WL 2954675, at *1 (S.D. Fla. June 30, 2017).

Thus, like the prior two factors, the third factor also strongly supports a grant of preliminary approval in this matter.

C.   **If the Court is Inclined to Look Beyond Preliminary Approval,
the Standard for Final Approval is Also Satisfied Here**

Although this Court is not required to look beyond the standard for preliminary approval at this stage, courts have at times conducted a "preliminary evaluation" of the factors relevant to final approval in deciding whether to preliminarily approve a proposed class action settlement. Those six factors are set forth in *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984), and are as follows: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, reasonable, and adequate; (4) the expected complexity, expense, and duration of the case; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Id.* at 986.

Here, a preliminary evaluation of those six factors strongly favors preliminary approval of the Settlement.

1.   **The Likelihood of Success at Trial**

The first factor the Court must consider is the Plaintiffs' likelihood of success at trial. Though the Plaintiffs and Class Counsel are confident in their case, they are also pragmatic. They understand that CBRE's and Hernandez' motions for summary judgment could have had an impact on the scope of the claims to be tried, that CBRE and Hernandez would continue to vigorously defend the case, and that there are inherent risks to litigation, especially jury trials. They also understand that even if they were to succeed on one or more of their claims at trial, there is no guarantee that they would recover the full amount of the Class' claimed damages. There is a possibility that the jury would award something less than the $139,596,957 sought.

Those uncertainties all favor approval of the proposed Settlement in this class action. *See Hugo*, 2011 WL 13173025, at *6 (citing "potential loss at the summary judgment stage" and "uncertain[ty]" as to "the amount of recoverable damages" as reasons to approve settlement); *Burrows v. Purchasing Power, LLC*, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013) ("Plaintiffs likelihood of success is not certain in this case . . . [and] because success at trial is not certain for Plaintiff[s and the Class], this factor weighs in favor of accepting the settlement."); *Thorpe v. Walter Investment Mgt. Corp.*, 2016 WL 10518902, at *3 (S.D. Fla. Oct. 17, 2016) ("[E]ven though the motions to dismiss were defeated and the class certified, Plaintiffs faced risks in litigating this action to a verdict. . . . This factor therefore supports approval."); *Dorado v. Bank of America, N.A.*, 2017 WL 5241042, at *4 (S.D. Fla. March 24, 2017) ("[W]hile the Plaintiff and her counsel have expressed confidence in their ability to prevail in this action, BANA has expressed confidence in its defenses and provided every indication that in

the absence of a settlement, it would mount a zealous defense. The Court notes that there are risks to the Plaintiff that are inherent in continuing this litigation.").

> **2.    The Range of Possible Recovery *and* the Range of Possible Recovery at Which a Settlement is Fair, Adequate, and Reasonable**

"The second and third factors, which are usually combined [in the analysis], require the Court to determine the possible range of recovery and then determine the minimum fair, reasonable, and adequate settlement within that range." *Thorpe*, 2016 WL 10518902, at *3. Here, the possible range of recovery is bracketed by the Plaintiffs' and CBRE's respective damage calculations. The Plaintiffs' experts calculated the Class' damages to be $139,596,957, while CBRE's experts offered alternate calculations which estimated the Class' damages to be between $16,108,958 and $371,166. [D.E. 256-5, pp. 8-12; 256-13, pp. 66, 89].

These figures do not encompass any potential special damages, such as punitive damages; nor should they, as such damages typically are not considered when evaluating settlements. The leading case on this issue is *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), which explains that:

> [T]o argue that treble damages ought to be considered in a calculation of a base recovery range is to distort the entire theoretical foundation which underlies the settlement process. It requires defendants to admit their guilt for the purpose of settlement negotiations. One of the underlying premises on which such negotiations are based, however, is that defendants never have to concede their guilt. They can protest their innocence of any wrongdoing and assert that they are settling for purely pragmatic business reasons. To require treble damages to be considered as part of the computation of the base liability figure would force defendants automatically to concede guilt at the outset of negotiations. Such a concession would upset the delicate settlement balance by giving too great an advantage to the claimants . . . which might well hinder the highly favored practice of settlement.

*Id.* at 459; *see also In re Dennis Greenman Sec. Litig.*, 622 F. Supp. 1430, 1441 (S.D. Fla. 1985), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir. 1987) ("The Court agrees with the rationale of the *Grinnell* court that potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 n. 25 (N.D. Ga. 1993) (same) (citing *Grinnell*); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) (disregarding potential for treble damages in evaluating fairness of settlement, citing *Grinnell*);

*In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1010 (N.D. Ohio 2016) (assessing range and fairness of potential recovery based on damages model prior to trebling).

In addition, courts also consider special damages, such as punitives, to be "speculative" and therefore not something that can be reliably included in the possible range of recovery. *See, e.g.*, *County of Monroe, Fla. v. Priceline.com Inc.*, No. 09-CV-10004-KMM, D.E. 215 (S.D. Fla. Sept. 3, 2010) ("In determining the reasonable range of settlements, the Court gives little weight to the potential for punitive damages as these damages were significantly more speculative than the actual damages caused by lost revenue or by the released future damages."); *Rougvie v. Ascena Retail Group, Inc*., 2016 WL 4111320, at *22 (E.D. Pa. July 29, 2016) (noting that the recovery of treble damages is "purely speculative . . . and need not be taken into account when calculating the reasonable range of recovery").

Thus, we respectfully submit that, in evaluating the second factor of the analysis here, the possible range of recovery should include only compensatory damages and should be considered to be between $139,596,957 and $371,166.

Next, the Court must determine whether the Settlement is fair, reasonable, and adequate in light of that possible range of recovery, keeping in mind certain established guiding principles. The first of those guiding principles is that "compromise is the essence of a settlement" and "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (internal quotation and citation omitted). The second is that "[a] settlement is fair, reasonable and adequate when the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1344-45 (S.D. Fla. 2011) (internal quotation and citations omitted).   In other words, the dispositive question is not "whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial"; for a proposed settlement to be approved, it must simply be "within the range of reasonableness." *Id*. at 1345, 1350 (internal quotation and citations omitted).

Here, the proposed Settlement is unquestionably within the range of reasonableness. The Settlement Amount – $100 million – equates to 71.6% of the Class' best-case recovery, which is far in excess of the norm.  Empirical studies of securities cases, for instance, show that class action settlements typically recover substantially less than 71.6% of class members' losses. The typical recovery in such cases is *less than 10%* of the class members' estimated losses.

*See, e.g., In re Rite Aid Corp. Securities Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (recognizing that "a recent study shows that settlements since 1995 of securities class actions 'have recovered between 5.5% and 6.2% of the class members' [total] estimated losses'"); Laarni T. Bulan, Ph.D, et al., *Securities Class Action Settlements – 2016 Review and Analysis* 8 (Cornerstone Research 2016) (concluding that, from 2006 to 2016, the median settlement amount in securities class actions was approximately 2.5% of the class members' total estimated losses).

Consistent with those studies, this Court and others in Florida have routinely approved settlements which recover single-digit percentages of the class members' total estimated losses. *See, e.g., Thorpe*, 2016 WL 10518902, at *4 (approving settlement that returned to class members "an excellent 5.5% of maximum damages and 10% of the most likely damages scenario"); *Strube v. American Equity Investment Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving settlement which recovered approximately 2% of expert's damage calculation). Indeed, this Court has found that settlements recovering even less than 1% of the class members' total losses can be fair, reasonable, and adequate. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.").

In the present case, the negotiated Settlement Amount is at the other end of the spectrum, and there can be no serious dispute that it is fair, reasonable, and adequate.

### 3.     The Anticipated Complexity, Expense, and Duration of Litigation

The next factor which this Court must consider is the anticipated complexity, expense, and duration of the litigation.  This factor also strongly favors approval of the Settlement because the case is highly complex, would have been expensive to try, and would likely have dragged on for years of post-trial proceedings and appeals, thereby delaying any recovery for the Class.

"It is common knowledge that class action suits have a well deserved reputation as being most complex," *Cotton*, 559 F.2d at 1331, and the present case is by no means an exception. Though the Plaintiffs and other Class Members were all victims of a single fraudulent scheme, they were investors in six separate office properties, each with its own set of circumstances. Because the amounts of money embezzled from each of the six office properties differed and the properties themselves are different, this case involves several complex issues of law and fact which have been – and undoubtedly would have continued to be – hotly disputed and uncertain. That is particularly so with respect to the Plaintiffs' calculation of the Class' total damages, which required thousands of hours of effort, at great expense, and remains vigorously contested.

Ex. 4 (¶ 29); *Hugo*, 2011 WL 13173025, at *9 (citing contested issues as to liability and uncertainties regarding the recovery of damages as factors favoring approval of settlement).

Likewise, the anticipated expense of continuing this litigation also favors settlement. Class Counsel has already incurred approximately $1.75 million in out-of-pocket costs in prosecuting this lawsuit and expects the cost of trial preparation, trial, and ensuing proceedings would have been substantial.  That would only further reduce the Class' potential recovery herein. Ex. 4 (¶ 30); *Thorpe*, 2016 WL 10518902, at *3 (citing "complex and costly expert testimony" and the fact that "in Class Counsel's experience, ongoing discovery and trial preparation would have substantially increased costs to the Class" as "support[ing] approval" of settlement).

Similarly, a victory for the Plaintiffs and Class at trial would undoubtedly be followed by extensive post-trial motions, appeals, and other potential review, meaning it would likely be *years* before the Class obtained any recovery, instead of *weeks* under the Settlement.  Ex. 4 (¶ 31). Thus, the anticipated duration of the litigation also heavily favors approval of the Settlement. *See In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1345-46 ("Although this litigation has been pending for more than two years, recovery by any means other than settlement would require additional years of litigation in this Court and the appellate courts. . . .  In contrast, the Settlement provides immediate and substantial benefits to millions of BofA customers."); *Dorado*, 2017 WL 5241042, at *4 (approving settlement of class claims in part because it "offers the class a certain and substantial recovery that will be distributed promptly").

### 4.    The Opposition to the Settlement

The next factor the Court must consider is whether the Class Members have voiced any opposition to the proposed Settlement.  This factor cannot be assessed at this time because the Class has not yet been formally notified of the Settlement.  However, Class Counsel notes that it has informally reached out to Class Members in each of the Florida Properties to advise them of the Settlement and the proposed plan of allocating settlement proceeds among Class Members. The response has been uniformly positive, with Class Members expressing sincere gratitude. Class Counsel does not expect any objections to the Settlement or proposed plan of allocation, but if any are submitted we will address them in later filings.  Ex. 4 (¶ 36).

### 5.    The Stage of Proceedings at Which the Settlement Was Achieved

Finally, this Court must consider the stage of proceedings at which the settlement was achieved, in order "to ensure that [the] plaintiffs had sufficient information to evaluate the case and to determine the adequacy of the settlement."  *Thorpe*, 2016 WL 10518902, at *4.

Here, as noted above, Plaintiffs and Class Counsel prosecuted the case for over two years, during which time they defeated motions to dismiss, obtained certification of the Class, conducted extensive fact and expert discovery, responded to motions for summary judgment, and obtained favorable rulings on motions to exclude a variety of important expert testimony. Thus, the Plaintiffs and Class Counsel had ample time and information to properly evaluate the merits of the case and weigh the benefits of a proposed settlement against proceeding to trial. Ex. 4 (¶¶ 5-24, 27); *Thorpe*, 2016 WL 10518902, at *4 (plaintiffs defeated a motion to dismiss, obtained certification of a class, and took critical depositions, including an opposing expert, giving them "a strong understanding of the strengths and weaknesses of their case, and thus an ample basis for making an informed judgment that the settlement is fair and reasonable"); *Dorado*, 2017 WL 5241042, at *5 (approving settlement made "after meaningful discovery," which provided plaintiff with "sufficient information to determine" if settlement was adequate).

\* \* \*

In short, were this Court inclined to look beyond the standard for preliminary approval at this stage, the *Bennett* factors also counsel in favor of approving the Settlement.

## II.    THE PROPOSED METHOD OF CLASS NOTICE IS APPROPRIATE

Under Rule 23(e)(1), this Court must direct that notice of the proposed Settlement be given "in a reasonable manner to all class members who would be bound by the proposal." In this case, the proposed Settlement Notice attached as Exhibit 2 satisfies those requirements, both in terms of content and the proposed manner of dissemination.

### A.    The Form, Content, and Intended Method of Delivering the Proposed Notice are Adequate

Class Counsel prepared the proposed Settlement Notice in collaboration with CBRE's and Hernandez' respective counsel.  The Notice discloses all key terms of the Settlement in sufficient detail to permit each interested Class Member to evaluate the terms of the Settlement and the proposed plan of allocating the settlement proceeds among the various Class Members. It also encloses a copy of the Settlement Agreement itself and advises the Class Members of their right to object and how to do so if they are inclined.

In addition, Class Counsel has disclosed in the Settlement Notice that it will be seeking (i) an award of reasonable attorneys' fees not to exceed one-third of the Settlement Amount, (ii) reimbursement of its out-of-pocket litigation costs, which total approximately $1.75 million, and (iii) incentive awards to the two Class Representatives in the amount of $50,000 each, in recognition of the time and effort they expended in pursuing the case on behalf of the Class.

The Notice advises Class Members when that application is expected to be filed with the Court, how they may obtain a copy of it, and how they may submit objections if they are so inclined.

Class Counsel intends to send the Settlement Notice to each individual Class Member via first-class certified mail, which is the best method for providing notice of class settlements and the method this Court approved for the dissemination of earlier notices in this litigation. *See Adams v. Southern Farm Bureau Life Ins. Co.,* 493 F.3d 1276, 1286-87 (11th Cir. 2007); *Holman v. Student Loan Xpress, Inc.,* 2009 WL 4015573 at *6 (M.D. Fla. Nov. 19, 2009); 2 NEWBERG ON CLASS ACTIONS, §8.24 at 8-75 to 8-76 (3d ed. 1992); [D.E. 211, 213].

### B. The Court Should Decline to Exercise its Discretion to Require a Second Opportunity to Opt-Out

As noted above, after this Court entered its Order Granting Motion for Class Certification herein, the requisite Notice was mailed to all 179 Class Members and none opted out of the Class. Under Rule 23(e)(4), the Court may require the Class be given a second opportunity to opt-out at this stage, but it is not obligated to do so. The decision to grant a second opportunity to opt-out "is wholly within the discretion of the district court." *In re Health South Sec. Litig.*, 334 Fed. App'x 248, 254 n. 12 (11th Cir. 2009); *see also Holman v. Student Loan Xpress, Inc.*, 2010 WL 4054275, at *1, n. 1 (M.D. Fla. Oct. 14, 2010) (same).

Class Counsel respectfully submits that the Court should decline to exercise that discretion in this case. Courts routinely eschew a second opportunity to opt-out in the settlement context, reasoning that class members will have the opportunity to object to the settlement instead. *See, e.g., Ruderman v. Wash. Nat'l Ins. Co.*, 2010 WL 11505859, at *4 (S.D. Fla. Aug. 27, 2010) ("Since [the] Settlement Class Members have been previously identified; have already been given notice of the action and the opportunity to opt out; and since they will receive dual notice of the proposed Settlement and the opportunity to object and intervene, the Court in exercising its discretion finds that a second opportunity to opt out is not warranted in this case.") (citing cases). In the words of another district court:

> Class members who have already been afforded an opportunity to opt out have been informed that they are bound by any settlement or judgment on the merits. . . . Class members who did not opt out and disagree with the proposed settlement will have an opportunity to object to the proposed settlement. The Court therefore concludes that a second opportunity to opt out is not warranted and that approval of the proposed class notice is proper.

*Pierce v. Novastar Mortgage, Inc.,* 2007 WL 1847216, at *3-4 (W.D. Wash. June 27, 2007); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347, at *4

(N.D. Ill. Apr. 4, 1996) ("Due process demands only that the class be given notice of the settlement and an opportunity to be heard. . . .  Where these objectives are satisfied, due process does not warrant a second chance to opt-out of the plaintiff class.") (citation omitted).

Significantly, courts have also recognized that requiring a second opportunity to opt-out in the settlement context can "impede the settlement process [which is] so favored in the law." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 635 (9th Cir. 1982) (citation omitted). "Requiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006).

In this case, requiring a second opportunity to opt-out would be especially disruptive, since the proposed Settlement, if approved, will effectively end this litigation in its entirety. The Court should therefore exercise its discretion not to permit opt-outs at this stage.

## III.    CITY NATIONAL BANK SHOULD BE APPROVED AS ESCROW AGENT

The Settlement Agreement calls for Class Counsel, CBRE, and a banking institution approved to serve as Escrow Agent to enter into an Escrow Agreement pursuant to which an Escrow Account will be established as a "qualified settlement fund" to receive and maintain the Settlement Amount and any interest thereon for the benefit of the Class.  Ex. 1 (¶¶ 7, 9). The Agreement also requires those funds to be maintained exclusively in instruments or accounts backed by the full faith and credit of the U.S. Government or fully insured by the U.S. Government or an agency thereof, such as the Federal Deposit Insurance Corporation ("FDIC").  *Id.* (¶ 7).

Class Counsel asked four banking institutions interested in serving as Escrow Agent to submit proposals for an Escrow Account which would satisfy the foregoing requirements. The most favorable proposal was received from City National Bank of Florida ("CNBF"), an institution headquartered in Miami with more than $14 billion in assets under management, making it one of the largest banks in Florida.  CNBF's proposal, which is attached as Exhibit 3, calls for the Settlement Amount to be held in an interest-bearing depository account which satisfies the requirements of a "qualified settlement fund" and will be fully insured by the FDIC. The interest rate will be 2.15%, which we believe will generate sufficient interest income to cover the expenses associated with administering the Settlement and potentially enable a distribution of residual interest to Class Members at the end of the claims process.  Ex. 3 (p. 1); Ex. 4 (¶ 38).

Class Counsel, therefore, respectfully requests that the Court approve CNBF to serve as Escrow Agent and maintain the Escrow Account in which the settlement proceeds will be held.

## IV.     PROPOSED TIMETABLE FOR FINAL APPROVAL OF THE SETTLEMENT

Lastly, Class Counsel proposes that this Court establish the following timetable for final approval of the Settlement and related matters:

(1)     Within 3 days after this Court's Order preliminarily approving the Settlement, Class Counsel shall send the Settlement Notice to all Class Members;

(2)     Within 15 days after this Court's Order preliminarily approving the Settlement, Class Counsel shall file a motion for final approval of the Settlement along with an application for attorneys' fees, reimbursement of costs, and incentive awards for the Class Representatives;

(3)     Objections to the settlement and/or the application for attorneys' fees, costs, and incentive awards shall be due 30 days prior to the final approval hearing;

(4)     Class Counsel's responses to objections, if any, shall be filed at least 7 days prior to the final approval hearing;

(5)     Class Counsel shall also cause affidavits or declarations to be filed by the person(s) under whose general direction the mailing of the Settlement Notice was made at least 7 days prior to the final approval hearing; and

(6)     The final approval hearing should be scheduled in early November of 2018 or as the Court's calendar permits.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the entry of an Order: (1) preliminarily approving the Settlement Agreement with Defendants CBRE and Hernandez; (2) preliminarily approving the proposed plan of allocating settlement proceeds detailed above; (3) approving the proposed Settlement Notice; (4) approving the proposed method of delivering the Settlement Notice to the Class; (5) approving City National Bank of Florida to serve as Escrow Agent and maintain the Escrow Account in which the settlement proceeds will be held; and (6) establishing the deadlines proposed herein, along with a date for a final hearing.

Dated:  August 22, 2018                     Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Counsel for Plaintiffs and the Class
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone:  305.789.3200
Facsimile:  305.789.3395

/s/ Jason P. Hernandez
Eugene E. Stearns
Florida Bar No. 149335
estearns@stearnsweaver.com
Jason P. Hernandez
Florida Bar No. 18598
jhernandez@stearnsweaver.com
Matthew W. Buttrick
Florida Bar No. 176028
mbuttrick@stearnsweaver.com
Mary Barzee Flores
Florida Bar No. 797235
mbarzeeflores@stearnsweaver.com
Cecilia Duran Simmons
Florida Bar No. 469726
csimmons@stearnsweaver.com
Matthew C. Dates
Florida Bar No. 90994
mdates@stearnsweaver.com
Matthew M. Graham
Florida Bar No. 86764
mgraham@stearnsweaver.com
Ryan T. Thornton
Florida Bar No. 99195
rthornton@stearnsweaver.com
Joseph J. Onorati
Florida Bar No. 92938
jonorati@stearnsweaver.com

## CERTIFICATE OF SERVICE

I CERTIFY that on August 22, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below via transmission of Notices of Electronic Filing generated by CM/ECF or other approved means.

_____/s/ Jason P. Hernandez_____
Jason P. Hernandez

## SERVICE LIST

David B. Weinstein (604410)
weinsteind@gtlaw.com
Ryan T. Hopper (107347)
hopperrr@gtlaw.com
Danielle M. Diaz (43704)
diazd@gtlaw.com
Jillian M. Askren (121773)
askrenj@gtlaw.com
GREENBERG TRAURIG, P.A.
101 E. Kennedy Blvd., Suite 1900
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900
*Co-Counsel for Defendant CBRE, Inc.*

Jeffrey Allan Hirsch (199850)
hirschj@gtlaw.com
GREENBERG TRAURIG, P.A.
401 E Las Olas Blvd Ste 2000 Ft. Lauderdale,
FL 33301-4223
Telephone: (954) 768-8285
Facsimile: (954) 765-147
*Co-Counsel for Defendant CBRE, Inc.*

Jared E. Dwyer (FBN 104082)
dwyerje@gtlaw.com
GREENBERG TRAURIG, P.A.
333 SE 2nd Ave Miami, FL 33131-2176
Telephone: (305) 579-0564
Facsimile: (305) 579-0717
*Co-Counsel for Defendant CBRE, Inc.*

Hardy L. Roberts, III (0062545)
hroberts@careyomalley.com
CAREY, O'MALLEY, WHITAKER,
MUELLER, ROBERTS & SMITH
712 S. Oregon Avenue
Tampa, Florida 33606
Tel: (813) 250-0577
*Co-Counsel for Defendant CBRE, Inc.*

Peter W. Homer, Esq. (291250)
phomer@homerbonner.com
Kevin P. Jacobs, Esq. (169821)
kjacobs@homerbonner.com
Gregory J. Trask, Esq. (005583)
gtrask@homerbonner.com
HOMER BONNER JACOBS, P.A.
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Tel: (305) 350-5100
*Counsel for Defendant Gloria Hernandez*

James M. Miller (201308)
james.miller@akerman.com
Ishmael A. Green (109100)
Ishmael.green@akerman.com
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, Florida 33131
Tel: (305) 374-5600
Fax: (305) 374-5095
*Counsel for Defendant, Harry L. Silverman*